90 U.S. 321
 23 L.Ed. 143
 23 Wall. 321
 SLACK
v.
TUCKER & C .
 October Term, 1874
 
 ERROR to the Circuit Court for the District of Massachusetts.
 Tucker & Co., partners, sued, in the said court, Slack, collector of internal revenue in the city of Boston, to recover the amount of certain taxes paid by them under protest, and which they alleged to have been illegally assessed. The court, having tried the cause without a jury, held the tax illegal and a recovery was had. This writ of error was brought by the collector to reverse the judgment.
 The tax was assessed against Tucker & Co. as 'wholesale dealers' under the seventy-ninth section of the Internal Revenue Act of June 30th, 1864, as amended by the act of July 13th, 1866.[1]
 It was agreed, on the trial, that if upon the facts the court should decide that the plaintiffs were not liable to the tax as 'wholesale dealers,' but were liable to a tax of one-half the amount as 'commercial brokers' under the fourteenth clause of the seventy-ninth section, and under the ninety-ninth section as amended, judgment should be rendered in their favor for half the amount claimed and interest, subject to the defendant's exceptions.
 The statutory provisions referred to, and on the construction of which the case principally depended, were expressed in the following terms:
 1st. As to wholesale dealers, the seventy-ninth section, as amended, enacted thus:
 'Wholesale dealers, whose annual sales do not exceed $50,000, shall pay $50; and if their annual sales exceed $50,000, for every additional $1000 in excess of $50,000, they shall pay $1. . . . Every person shall be regarded as a wholesale dealer whose business it is, for himself or on commission, to sell, or offer to sell, any goods, wares, or merchandise of foreign or domestic production, not including wines, spirits, or malt liquors, whose annual sales exceed $25,000.'
 An exception was made in favor of manufacturers selling their own goods, by section seventy-four, as amended by the act of July 13th, 1866:[2]
 'But nothing herein contained shall require a special tax for . . . the sale by manufacturers or producers of their own goods, wares, and merchandise, at the place of production or manufacture, and at their principal office or place of business, provided no goods, wares, or merchandise shall be kept except as samples at said office or place of business.'
 2d. As to commercial brokers, the fourteenth clause of the seventy-ninth section, as amended in 1866, enacts as follows:[3]
 'Commercial brokers shall pay $20. Any person or firm whose business it is, as a broker, to negotiate sales or purchases of goods, wares, or merchandise, or to negotiate freights and other business for the owners of vessels or for the shippers or consignors or consignees of freight carried by vessels, shall be regarded a commercial broker.'
 And section ninety-nine, as amended, provides:[4]
 'And there shall be paid monthly on all sales by commercial brokers of any goods, wares, or merchandise, a tax of one-twentieth of one per centum upon the amount of such sales.'
 Under these statutes the plaintiffs contended first, that the sales made by them were made as mere agents of the manufacturers at their principal office and place of business, and therefore came under the exemption provided in section seventy-four, above quoted; secondly, that, at most, they were commercial brokers, and therefore liable for only one-half the amount for which they were assessed.
 The facts on which they relied in support of these positions sufficiently appeared from the bill of exceptions taken by the collector on the trial of the cause. It was shown—the testimony of the plaintiffs themselves showing this—that four manufacturing corporations, two of them having their factories at Nashua, New Hampshire, and chartered by that State, and two of them having their factories at Waltham and Clinton, in Massachusetts, and chartered by the latter State, and all manufacturing cotton goods had the same general office in Boston, where they held their meetings, transacted their business, and kept their records, and where they kept a common clerk and a common treasurer. The latter was the chief executive officer, buying all the raw material and making the other purchases for the corporations, taking care of their finances, and under the respective boards (which consisted of substantially the same persons) managing and controlling the affairs of the several corporations, their agents and servants.
 Between these corporations respectively and the plaintiffs, who were a mercantile firm, transacting business in Boston, under the name of Tucker & Co., there were separate agreements, either in writing or by parol, that the plaintiffs should sell all the goods manufactured by each corporation, for a fixed percentage on the amount of sales, and the course of business of the plaintiffs under and in pursuance of these agreements was as follows, that is to say: The plaintiffs had a store in Boston, which they hired in their own names, and for which they paid the rent, with clerks, bookkeepers, and other servants whom they employed and paid. In this store was a counting-room, in which their business was transacted, and chambers where samples of goods manufactured by the corporations were kept. No goods except sample-bales and packages were there kept, unless occasionally some goods which had been mis-sent, or for some reason had not been accepted by a customer, found their way there.
 The plaintiffs were known to be the agents of these corporations, to sell their goods, and they sold only the goods of these corporations, and their course of business was as follows: They were kept informed daily of what was manufactured at the several mills, and made sales to purchasers as opportunity offered. They kept in their office a different set of books for each of the corporations, and when a sale of any of the goods of any of the corporations was effected, an entry of the fact was made in the books of that corporation, and they informed the manufacturing agent at the mill of such corporation (where all the goods were stored as they were manufactured) to send such goods to the purchaser. The goods were then packed at the mill, and directed to the purchaser, and forwarded to Boston by rail, where a truckman, employed and paid by the plaintiffs, received them and delivered them to the purchaser, if in Boston, or at the steamboat landing or railroad station, if the goods were to be sent elsewhere. The freight by rail, from the mill to Boston, was paid by the plaintiffs, and was, with the expense of truckage, charged by them to the respective corporations. When sufficient time had elapsed after the sale for the delivery of the goods, the plaintiffs sent to the purchaser a bill of the goods in their own names, separate bills being rendered for the goods of each corporation, and not as agents, and in due course, when they were settled, receipted the bills in their own names, and not as agents. When the bills were paid in cash, the money was received by the plaintiffs and deposited in bank in their own names; and if on any given day money was received from sales of the goods of the different corporations, such money was mingled together and deposited by the plaintiffs in their own names. If the bills were settled by notes, the notes were made payable either to the order of the makers, and by them indorsed, or to the order of the particular corporation whose goods were sold. The plaintiffs did not put their names upon any such notes, nor did they guarantee any of their sales. They delivered these notes from time to time to the treasurer, and from time to time paid him money, and every month settled their account with each corporation.
 The plaintiffs had a branch house in New York, and an agency in Philadelphia, and the sales in New York and Philadelphia were reported to the Boston house, and deliveries and collections were made as to such sales in the same manner as in sales at the Boston house. Such sales were not included in their returns to the assessor at Boston, and no part of the taxes which this action was brought to recover was paid upon such sales at New York and Philadelphia.
 It was proved also that the several corporations had paid what is called the 'manufacturers' tax'—a tax of five per cent. upon all the goods that were sold by the plaintiffs.
 Upon this evidence adduced by the plaintiffs, the defendant moved for judgment on the following grounds:
 1st. Admitting all that was attempted to be proved, it manifestly appeared that the plaintiffs were wholesale dealers within the meaning of the law, and so liable to pay the tax collected.
 2d. That the sales made by the plaintiffs were not sales made by the manufacturing corporations within the meaning of the law; and
 3d. If the sales were made by the plaintiffs as agents of the manufacturing corporations, within the meaning of the law, they were not made at the place of manufacture, nor at the principal office or place of business of the corporations, but were made at the store of the plaintiffs.
 The court overruled the motion and ordered judgment to be entered for the plaintiffs for the full amount claimed.
 This judgment was of course to be reversed if, upon the evidence as disclosed, the defendants in error were either wholesale dealers or commercial brokers within the act. In the one case they could have recovered nothing, in the other only one-half of what they did recover.
 If on the contrary they were neither 'wholesale dealers,' nor 'commercial brokers,' within the act; or if the sales were sales made by the manufacturers at the place of production and at their principal office or place of business—no samples being kept there the judgment would be to be affirmed.
 
 Mr. H. D. Hyde, in support of the judgment below:
 
 The judgment below should be affirmed. A corporation can only act through agents, and the defendants were the agents of the several corporations for selling their goods. That they were such agents appears from their course of dealing and from the admitted fact that 'there were separate agreements, either in writing or by parol, that the defendants should sell all the goods manufactured by each corporation for a fixed percentage on the amount of sales.' The ownership or prossession of the goods never passed from the several corporations to the defendants. The transactions of each corporation were kept on separate books; separate bills of the goods of each corporation when sold were rendered; all expenses of transportation were paid by the respective corporations; and all notes taken for the payment of goods sold were the property of each corporation, and were delivered to its treasurer. The defendants 'were known to be the agents of these corporations to sell their goods.' An action could have been maintained by or against the several corporations upon the contract of sale.
 If the defendants were the agents of the respective corporations for selling their goods, were the goods sold at such a place that no tax could be assessed upon the sales? It is admitted that only samples were kept at the place of sale.
 The defendants sold all the goods of each corporation; none were sold at the place of production or manufacture. The only place where their goods were sold was the place where the defendants sold them. This place was, then, not only their principal office of place of business for selling, but it was their only office or place of business for that purpose.
 The purpose of a corporation in manufacturing goods is that it may sell them, and thereby make a profit. The goods are manufactured to sell, and, after they are manufactured, the principal business is to sell them. It is hardly fair to suppose that Congress intended to distinguish between the relative importance of the duties of the treasurer and selling agent of a corporation, but that the corporation having paid the 'manufacturers' tax,' five per cent., upon its production, should be llowed to sell its own goods, through its own agents, at the place of production, or at its office or principal place of business for selling.
 It may be argued that the defendants sold goods in Boston, New York, and Philadelphia, and that it does not appear which of the three was the principal place, or at which place the largest amount was sold. But it can hardly be supposed that Congress intended that, if a corporation manufactured goods in Maine, it should not have a right to sell them through their own agents at a recognized place of business in each of these cities upon the same terms; and that if it had an office and agent for selling in Boston, it could not have an additional office and agent for selling in New York, without paying in the latter place a tax of one dollar per thousand upon all its sales. In the present case, the goods upon which the tax was collected were all sold in Boston, and all sales passed through the books of the Boston house, and their place of business was the principal one for sales.
 It is asserted by the government that if the defendants were not required to pay the tax of one dollar per thousand on all sales made by them as wholesale dealers, they were liable to pay one-half of that amount as 'commercial brokers.' This we admit, provided that they were not exempt as previously shown.
 A wholesale dealer is a commission merchant who has possession of goods and sells them, one 'whose business it is for himself or on commission to sell or offer for sale any goods,' &c.
 A commercial broker is one 'whose business it is, as the agent of others, as a broker to negotiate sales or purchases of goods,' &c.
 The defendants were never commission merchants; and if they were not the selling agents they were only brokers, negotiating sales for their principals, and should only have been taxed as such. The distinction between a 'wholesale dealer' and a 'commercial broker' is as marked and distinct as it is between a commission merchant and a broker.
 Mr. G. H. Whillams, Attorney-General, and Mr. S. F. Phillips, Solicitor-General, contra, for the plaintiff in error.
 Mr. Justice BRADLEY delivered the opinion of the court.
 
 
 1
 The general meaning of the act of Congress in the passages under consideration is sufficiently clear. Congress evidently intended to tax as 'wholesale dealers' as well those who sold goods as commission merchants as those who sold on their own account; always excepting manufacturers, selling at the place of manufacture, or by sample at their principal office and place of business. The intention is equally evident to tax as 'commercial brokers' those who, as brokers merely, negotiated sales or purchases for others, and not in their own names nor on their own account.
 
 
 2
 We are clearly of opinion that the evidence propounded by the plaintiffs showed that the sales were not the sales of the corporations made by the plaintiffs as mere agents, much less that they were made at the principal office or place of business of the corporations. The latter had an office and place of business of their own where their principal executive officer managed their executive and financial operations, and to which any persons having business with the corporations would naturally go. On the contrary, the store of the plaintiffs was their own store, hired and furnished by themselves. The clerks employed in it were their own clerks. All the expenses were paid by themselves. The business was carried on in their own names. The sales were made, and the bills made out, in their names. The money arising from the sales was paid to them and deposited to their account. They charged regular commissions on the sales. It is true they sold by sample, and did not keep the goods in their store; but that did not make the sales any less their own. Persons selling their own goods often do the same. But, though they did not keep the goods at their store, and though, as sales were made, the goods by their direction were put up at the mill and directed to the urchasers, yet they were sent to and received by the plaintiffs; who delivered them if the purchasers were in Boston, or shipped them if the purchasers resided elsewhere. The goods passed through their hands before the purchaser received them. They came into their possession as soon as it was necessary to enable them to fulfil their contracts of sale.
 
 
 3
 In our opinion, therefore, the plaintiffs were commission merchants, and chargeable as such with the tax in question as 'wholesale dealers.' The difference between a factor or commission merchant and a broker is stated by all the books to be this: a factor may buy and sell in his own name, and he has the goods in his possession; while a broker, as such, cannot ordinarily buy or sell in his own name, and has no possession of the goods sold.[5] The plaintiffs made the sales themselves, in their own names, at their own store, and on commission, and had possession of the goods as soon as the sales were made, and delivered or shipped them to their customers. This course of business clearly constituted them commission merchants as contradistinguished from mere brokers or agents.
 
 
 4
 The fact that the corporations paid the manufacturing tax of five per cent. on the same goods is of no consequence at all in deciding the case. The tax in question was not imposed upon the corporations, but upon the commission merchants, as a tax on their business. It would even have been imposed on the corporations themselves if they had sold the goods in any other manner than as provided in the seventy-fourth section of the act, namely, at the place of manufacture, or, by sample, at their principal office and place of business.
 
 
 5
 We are of opinion, therefore, that upon the evidence adduced, the court ought to have given judgment for the defendant instead of the plaintiffs.
 
 JUDGMENT REVERSED, with directions to award
 
 6
 A VENIRE DE NOVO.
 
 
 7
 Mr. Justice FIELD dissented from the judgment, being of opinion that the plaintiffs were not wholesale dealers, either within the common acceptation of the terms or the meaning of the statute.
 
 
 
 [1]
 14 Stat. at Large, 115.
 
 
 [2]
 14 Stat. at Large, 113.
 
 
 [3]
 Ib. 117.
 
 
 [4]
 Ib. 134.
 
 
 [5]
 See Story on Sales, § 91; Story on Agency, § 34; 2 Kent, 622, note; and cases cited.