### COTHRAN & CONNALLY v. UNITED STATES.

(District Court, W. D. Virginia, at Lynchburg.   October 6, 1921.)

1. **Statutes ☞179—Statutory definition given word to be adhered to.**
    Where a statute defines the meaning of a word, it is improper to seek to give it a different meaning.

2. **Internal revenue ☞9—"Broker" held to include tobacco warehouseman.**
    The word "broker," as used in Revenue Act 1918, § 1001, subsec. 1 (Comp. St. Ann. Supp. 1919, § 5980o), requiring brokers to pay special tax, includes tobacco warehouseman, who brings about sales of tobacco by mutual arrangement.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Broker.]

3. **Evidence ☞21—Judicial notice that stockbroker gets stock certificate indorsed in blank from seller.**
    It is a matter of common knowledge that a stockbroker commissioned or directed to sell shares of stock frequently, if not usually, gets the stock certificate (indorsed in blank) from the seller and then finds a purchaser, and frequently the seller does not know who the purchaser is.

At Law.   Action by Cothran & Connally against the United States. Judgment for defendant.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Harrison & Long and S. H. Williams, all of Lynchburg, Va., for petitioners.

Thos. J. Muncy, U. S. Atty., of Roanoke, Va., and C. E. Gentry, Asst. U. S. Atty., of Charlottesville, Va., for the government.

McDOWELL, District Judge. This is a proceeding, brought under subsection 20 of section 24, Judicial Code (Comp. St. § 991 [20]), and sections 4, 5, 6, 7, and 10 of the Tucker Act (24 Stat. 505--507 [Comp. St. §§ 1574-1578]). See also 30 Stat. 495. The right of the petitioners to sue the United States was not questioned. U. S. v. Hvoslef, 237 U. S. 1, 35 Sup. Ct. 459, 59 L. Ed. 813, Ann. Cas. 1916A, 286; U. S. v. Emery, 237 U. S. 28, 32, 35 Sup. Ct. 499, 59 L. Ed. 825. The ground of action was that the petitioners had been required to pay, under duress and after protest, a special tax on brokers under section 1001 (1) of the Revenue Act of 1918 (40 Stat. 1126 [Comp. St. Ann. Supp. 1919, § 5980o]). This statute reads:

"Brokers shall pay $50. Every person whose business it is to negotiate purchases or sales of stocks, bonds, exchange, bullion, coined money, bank notes, promissory notes, other securities, produce or merchandise, for others, shall be regarded as a broker. * * *"

## Findings of Fact.

During the period covered by the assessment here the petitioners were engaged in the business of tobacco warehousemen. They had previously leased a warehouse at Brookneal, Va., and had, as is usual in such business, solicited in various ways the neighboring tobacco growers to send leaf tobacco to petitioners to be sold, and had arranged with the principal manufacturers of tobacco to have buyers assemble at the warehouse on fixed occasions to buy the tobacco. The leaf tobacco was brought by the grower to the warehouse, where it was displayed on the floor in weighed piles of different grades, each ticketed with the name of the grower and the weight. Subject, usually, to right of rejection on the part of the grower, at prescribed times, the warehousemen held auction sales of the piles of tobacco. The warehousemen acted as, or employed, auctioneers. The highest bidder on each pile became the purchaser thereof, unless such bid was rejected. If the bid was not rejected, the warehouseman, promptly after the conclusion of the sale, paid the grower the bid price of the tobacco, less a commission of 2 per cent. and a charge for weighing. Later on the warehouseman collected the purchase price from the successful bidder. The buyers and sellers were not usually brought into personal contact; the seller looked to the warehouseman for his share of the selling price, and the warehouseman looked to the buyer to pay for the tobacco.

The right of rejection is a somewhat peculiar feature of this business. In a great majority of instances the growers personally attend the sales, and if the highest bid is unsatisfactory to the grower he rejects the bid, and the sale is then nullified. In such case the grower may leave the particular pile or piles on the floor, to be offered at the next sale, or may remove it from the warehouse. In some exceptional cases, after a rejection, the warehouseman may induce the grower to recall his re-

jection and accept the bid as made, or may induce the bidder to increase his offer, and thus effect a sale. ' '

Where the grower does not attend the sale in person he may, and usually does, by prearrangement with the warehouseman, fix a minimum price for his tobacco. In such event the warehouseman rejects the bid, where it is less than the minimum.

I further find that the tax (and penalties) were paid under duress, after threat of seizure and sale of the personal property of petitioners had been made, and with protest against the validity of the assessment.

## Opinion.

[1, 2] Where a statute defines the meaning of a word it is clearly improper to seek to give such word a different meaning. The word "broker," as used in subsection 1 of section 1001 of the Revenue Act of 1918 (40 Stat. 1057, 1126), is defined in this section. One of the common meanings of the word "negotiate," found in the Century Dictionary and in Webster's Dictionary is "to bring about by mutual arrangement." The evidence in this case shows that the very essence of the business of the petitioners was to arrange that tobacco planters should bring their produce to petitioners' warehouse to be sold at auction, and that tobacco buyers should attend such auction sales and bid for the tobacco. The petitioners clearly brought about sales of tobacco by mutual arrangement. The planter was given to understand that petitioners would have buyers present to bid, and the buyers were given to understand that planters would have tobacco in the warehouse to be sold. The petitioners conducted their business successfully only in so far as they brought about this mutual arrangement between the planters and the buyers.

[3] In this same subsection stock brokers are included. It is matter of common knowledge that the stock broker, commissioned or directed to sell shares of stock, frequently, if not usually, gets the stock certificate (indorsed in blank) from the seller, and then finds a purchaser, and frequently the seller does not know who the purchaser is. So, also, in case a stock or bond broker is directed to buy. In all cases the stock or bond broker negotiates sales and purchases because he brings them about by mutual arrangement. It is true that in some brokerage businesses it is usual for the broker, as in real estate brokerage, to bring the buyer and seller together. But the definition of broker in this statute is much too comprehensive to make it permissible to restrict the word to cases in which the broker effects the sale by bringing the seller and the buyer together.

It is sought to exclude tobacco warehousemen from this section of the statute on the ground that such persons have the custody and possession of the article to be sold. This is also frequently true of stock and bond brokers, bullion and exchange brokers, and note brokers. Moreover, the possession of the article to be sold does not in the least prevent the business of a tobacco warehouseman from being that of "negotiating sales of produce or merchandise."

A reason of no slight force for concluding that subsection 1 of section 1001 of the Revenue Act of 1918 was intended to include tobacco

warehousemen is this: Section 704 of this statute (40 Stat. 1118
[Comp. St. 1919, § 6168]) repeals section 35 of the Act of August 5,
1909 (36 Stat. 11, 110, 111 [Comp. St. § 6175]), which defines a dealer
in leaf tobacco as any person, other than the farmer or producer, who
sells leaf tobacco to manufacturers of tobacco, snuff or cigars, and
makes such dealers subject to a special tax as such. See section 3244,
R. S. (Comp. St. § 6176); 20 Stat. 343; 22 Stat. 488. Having thus
(in section 704) repealed the tax on dealers in leaf tobacco, there was
inserted in subsection 1 of section 1001 the words "produce or mer-
chandise." The corresponding provision of the Revenue Act of 1916
(39 Stat. 757, 790 [Comp. St. § 5980b]) read:

"Brokers. * * * Every person, firm, or company, whose business it is
to negotiate purchases or sales of stocks, bonds, exchange, bullion, coined
money, bank notes, promissory notes, or other securities, for others, shall be
regarded as a broker."

The fact that the Revenue Act of 1918 repealed the tax on dealers in
leaf tobacco and copied the foregoing provision with the addition of
the words "produce or merchandise," seems to make quite clear the in-
tent to subject tobacco warehousemen to the brokers' tax, in lieu of
the former tax on dealers in leaf tobacco. It may be that the chief pur-
pose of the change made in the act of 1918 was to exempt from the
special tax on dealers in leaf tobacco the independent buyers of leaf
tobacco. But the intent to leave tobacco warehousemen subject to a
special tax seems clear enough, as does the intent that they should be
taxed as brokers of produce or merchandise, instead of as dealers in
leaf tobacco. As tobacco warehousemen had been (section 3244, R. S.)
for many years, in times of peace, subjected to an occupation tax, and
remained so taxed under the Revenue Acts of 1916 and 1917, it is
difficult to conceive of any reason for an intent on the part of Congress,
in drafting the Revenue Act of 1918, to exempt them from such tax.
Tobacco warehousemen might be classified as dealers in leaf tobacco, as
commission merchants, or as brokers. But no classification more
clearly includes them than does the language of the section under con-
sideration. They undoubtedly do "negotiate sales of produce." I find
nothing in Slack v. Tucker, 23 Wall. 321, 23 L. Ed. 143, which seems to
require a different conclusion.

In accordance with the foregoing finding of facts and opinion, I
shall enter judgment in favor of the defendant.