# City of Owensboro, et al. v. Dark Tobacco Growers' Association.

(Decided December 2, 1927.)

## Appeal from Daviess Circuit Court.

1. Taxation.—Acts 1924, c. 116, sec. 4, exempting unmanufactured agricultural products in hands of producer or his agent from local taxation, held proper exercise of power granted by Constitution, sec. 171, to General Assembly "to divide property into classes and to determine what class or classes of property shall be subject to local taxation."

2. Taxation.—Contract of co-operative marketing association, organized as nonprofit-earning corporation under Bingham Co-operative Marketing Act (Ky. Stats. Supp. 1924, secs. 883f-1 to 883g-29) with its members, pursuant to section 17, by which tobacco was to be delivered to association, which was to have title and power to borrow money thereon, but was required to account for all profits to growers, held not contract of sale, but contract for agency only, by virtue of which agricultural products in association's hands were exempt from local taxation under Act March 4, 1924 (Acts 1924, c. 116, sec. 4).

3. Contracts.—All of provisions of contract should be considered in order to ascertain intent of parties.

4. Sales.—In determining whether contract constitutes sale or mere agency, court will look to real nature of agreement and intention of parties, and will ignore apparently inconsistent language used in isolated expressions.

R. MILLER HOLLAND for appellants.

LOUIS I. IGLEHEART for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

Appellee is a nonprofit-earning corporation organized under the provisions of the Bingham Co-operative Marketing Act, being sections 883f-1 to 883g-29.

In July, 1924, it had on hand in Owensboro, Ky., a municipality of this state, approximately $350,000 worth of tobacco. The municipality assessed the same for municipal purposes, and was proceeding to enforce the collection of such taxes when this action for an injunction was instituted by the association.

The two questions raised are: (1) The constitutionality of the exemption act of the General Assembly, being section 4, c. 116, of the Acts of 1924; and (2) is the To-

bacco Growers' Marketing Agreement a contract of sale to the association, or is it merely a contract of agency?

The constitutional question raised appears to have been urged by appellant in the court below, but we are relieved from the necessity of going into a discussion of it here because it is conceded by counsel that it is settled by the case of Gray, Sheriff, etc. v. Reynolds Tobacco Co., 200 Ky. 47, 252 S. W. 134. That case so explicitly and expressly settles the constitutionality of the act involved that further discussion of it would be merely repetition.

The present section 171 of our Constitution expressly grants to the General Assembly "power to divide property into classes and to determine what class or classes of property shall be subject to local taxation."

Obviously, the Act of March 4, 1924, was an exercise of the power granted by section 171 when it exempted from local taxation "machinery and products in course of manufacture, by persons, firms, or corporations, actually engaged in manufacturing, and their raw material actually on hand at their plants for the purpose of manufacture and unmanufactured agricultural products in the hands of the producer or in the hands of any agent or agency of the producer to which said products have been conveyed or assigned for the purpose of sale by the producer."

The co-operative agreement purports on its face to be an agreement among the growers of dark tobacco and landlords who have such tobacco for sale to enter into such cooperative organization to intelligently sell and market their tobacco, so that speculation therein might be reduced, or market therefor stabilized, and the handling of said tobacco co-operatively and collectively done, "and for other pertinent purposes." The agreement provides for a directorate of 25 persons, 23 of them to be from districts in the dark tobacco producing section, and provides for the manner of their selection. It provides for an appointment by the directors of an executive committee to conduct the affairs of the association, subject to the general control of the board; it provides for a selling committee for each type of tobacco grown in that section, and for many other details including an entrance fee of $5 for each member.

The contract makes the grower a member of the association, and binds him to help carry out its aims. The

association agrees to buy and the grower agrees to sell and deliver to it all the tobacco produced by or for him or acquired by him during a specified period.

The association agrees to resell such tobacco, together with tobacco of like type, grade, and quality delivered by other growers under similar contracts, at the best prices obtainable by it under market conditions, "and to pay over the net amount received therefrom (less freight, insurance, and interest) as payment in full to the grower and growers named in contracts similar hereto, according to the tobacco delivered by each of them, after deducting therefrom, within the discretion of the association, the cost of maintaining the association and of handling, grading, and marketing such tobacco." The grower agrees that the association may handle, in its discretion, some of the tobacco in one way and some in another, but the net proceeds of all tobacco or tobacco products of like type, quality and grade, less charges, costs and advances, shall be divided ratably among the growers in proportion to their several deliveries The association may sell the tobacco within or without the United States, directly to manufacturers or exporters or otherwise, at such time and in such form and upon such conditions and terms as it may deem profitable, fair and advantageous to the grower. The grower agrees that the association shall have absolute title to the tobacco upon delivery, and that the association may borrow money in its name on the tobacco, but that it shall prorate the money so received among the growers equitably.

Under the provisions of section 17 of the Bingham Act, being subsection 17 of section 883-f of the 1924 Revision of Baldwin's Kentucky Statutes, the association is authorized to enter into either selling contracts with its members, or the contract may provide for the delivery to it by its members of agricultural products without taking title thereto in the association, but requiring it to pay over to its members the resale price after deducting necessary costs and expenses. In other words, the act appears to contemplate either that the association may buy and become the absolute owner of the growers' product, or it may act as a selling agent for the grower and enter into a contract for that purpose alone.

If the contract in question is one whereby the association became the absolute owner of the growers' tobacco, then under the terms of the quoted section of the statute

the product was not in the hands of either the producer or any agent of his, and was necessarily subject to the tax assessed. On the contrary, if the contract between the grower and the association is only a contract of agency whereby the association took custody of his tobacco under an agreement to sell the same for him and pay to him the proceeds less costs and expenses, then it was a contract of agency and the beneficial title remained in the grower.

Unquestionably, as argued by appellant, some of the language used in certain parts of the contract are words of sale and not of agency; but when you take the contract by its four corners and analyze all of its provisions and go to the very core to ascertain what was in the minds of the parties, and when you look to the conditions which brought about the organization of such marketing associations, it is not difficult to see, notwithstanding apparently inconsistent language used, that the whole thing was nothing more nor less than the transfer by an aggregation of growers of the naked title to their product, for marketing purposes, to an association formed and organized by the growers themselves, and which they absolutely controlled.

Obviously the central purpose in the contract was to create an agency with the absolute power in the designated agent to handle and market the tobacco of the grower without interference by the grower in the agent's manner of handling and marketing, and yet with an ironclad agreement that the agent should have no profit, but account to the grower for the full proceeds of the sale of his property less the costs and expenses of handling and selling.

If, as contended by appellant, the contract was an absolute sale to the association whereby it acquired the absolute title to the tobacco, why was it necessary to incorporate in the agreement the provision that the association should have the right to mortgage the property so assigned to it? If it was an absolute sale to the association there could have been no necessity for the incorporation of such a provision for the association would have had as such owner the right to incumber its own property without the consent or agreement of its former owner.

This latter provision, and the provision that the association was to account to the grower for the full pro-

ceeds of his tobacco less costs and expenses, are absolutely convincing that it was not within the minds of the parties that the transaction was an absolute sale by the grower to the association; but on the contrary these provisions and the many detailed provisions for the operation of the association are wholly inconsistent with any other view than that they were entering into a contract of agency, whereby the association was given certain absolute power in the handling and marketing of the growers' property, but whereby it was required in the end to account to him for the full sale price of his product less costs and expenses.

In other words, it was essentially a sales contract of agency made by each grower with an association of his own creation primarily and essentially for his own benefit, and in no event for the benefit of the nonprofit-earning association which the several growers had organized.

In determining whether an agreement between parties is a sale or whether it is a mere contract of agency, isolated expressions in the instrument indicating whether it is one or the other are not necessarily controlling; on the contrary the courts will ignore apparently inconsistent language used, and look to the real nature of the agreement between the parties, what its real purpose was, and what, from the nature of the transaction, must have been in the minds of the parties.

In this case the association not only was the creature of the growers, but by its charter it had no right to make a profit out of the handling or sale of their products. The whole conception of the organization was that it was a marketing association created and organized for the purpose of advantageous marketing of the growers' product, not for the benefit of the association, but for the benefit of its members, who were all either growers or landlords.

A consideration of these facts makes it impossible that the parties could have had in mind any other thing than the creating of a sales agency in the execution of the several contracts.    22 R. C. L. p. 216; 2 C. J. pp. 420, 421; Haarparinne v. Butter Hill Fruit Growers' Association, 122 Me. 138, 119 A. 116.

It results from what we have said that the action of the trial court in overruling the demurrer to the petition was proper.

Judgment affirmed.