**MARYLAND & VIRGINIA MILK PRODUC-
ERS' ASS'N, Inc., v. DISTRICT OF
COLUMBIA.**

No. 7569.

United States Court of Appeals for the
District of Columbia.

Argued Dec. 10, 1940.

Decided April 21, 1941.

788

GRONER, C. J., dissenting in part.

———◆———

John S. Barbour, of Washington, D. C., for petitioner.

Glenn Simmon, of Washington, D. C. (Elwood H. Seal and Vernon E. West, both of · Washington, D. C., on the brief), for respondent.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

EDGERTON, Associate Justice.

Petitioner seeks review [1] of a decision of the Board of Tax Appeals for the District of Columbia which upheld, in part, assessments on intangible personal property for the fiscal years ended on June 30 in 1936, 1937, and 1938, and upheld and increased assessments on · the privilege of doing business in the District for the year ended June 30, 1938.

Petitioner is a non-stock cooperative membership corporation. It is incorporated under the laws of Maryland and licensed under the cooperative marketing law of Virginia. Its members are some 1150 dairy farmers (producers), none of whom lives in the District of Columbia. It sells, to distributors, substantially all the milk which its members produce. It makes contracts with distributors by which they agree to buy milk from it. The members deliver the milk to the distributors as petitioner directs. The distributors make their payments to it. It makes price adjustments, deducts one cent per gallon, and turns over the residue to the members. The one cent deduction has exceeded petitioner's operating expenses. The excess has been set up as a reserve, invested in securities, and retained for six years as a "revolving fund." Each year payments are made from this fund, to those who were members during the sixth preceding year, substantially in proportion to the gallonage contributed by them, but subject to certain variations.

All meetings of members are held at various places in Maryland and Virginia. The annual meeting of the Board of Directors is held in Maryland; but until June 25, 1938, petitioner carried on no other business at the office which it maintained there to comply with Maryland law. It maintained within the District of Colum-

1 Under D.C.Code, 1929, Supp. V, Tit. 20, Section 975.

bia its main business office, where most directors' meetings were held, accounts and records were kept, and the entire business was carried on. On June 25, 1938, it moved its main business office and records to Maryland. After that date, it maintained only storage space in the District. The move to Maryland in 1938 is immaterial here, for the personal property tax dates involved are July 1, 1935, July 1, 1936, and July 1, 1937,[2] and the business privilege tax became due in 1937.[3]

Petitioner made returns for intangible tax purposes for each fiscal year and paid taxes on money in banks in the District, certain investments of the revolving fund within the District, and certain bills receivable which arose from sources other than sales of milk produced by its members. On August 19, 1938, the District made an additional assessment of intangible personal property taxes for the three years, which aggregated $14,159.17.

Petitioner reported as subject to the business privilege tax the sales by it of small quantities of milk which it had bought from time to time from non-members and resold. It paid a tax assessed on that basis. It did not report the so-called "brokerage" of one cent per gallon which it received from the sale of the milk of its members. On August 10, 1938, an additional assessment of $818.71 was made on account of this "brokerage."

These increased assessments were paid under protest. On petition for refund, the Board of Tax Appeals of the District of Columbia upheld the increased assessments of personal property tax, except $2,534.29 found to have been erroneously assessed on government securities and on assets not owned by petitioner. The Board also upheld the additional assessment of the business privilege tax, and ordered that assessment increased by $16,170.86 since it concluded that the tax should be assessed not merely on the so-called "brokerage" but on the gross proceeds of the sales.

■■■ (1) *Assessment after the tax year.* Petitioner contends that since it made returns of its intangibles, and paid during the fiscal years in question the taxes which were assessed during those years, the assessors could not, after those years, make additional assessments. We need not consider this question, because it was not raised before the Board; but we are free to do so.[4] Petitioner argues that any change in the assessment of intangible personal property must be made within the "current year," under D.C.Code, Tit. 20, Section 769 and the holdings of this court in Tumulty v. District of Columbia[5] and Hunt v. District of Columbia.[6] It contends that the same principle is applicable to the business privilege tax.

The Hunt case did not involve, as this case does, the inclusion of previously omitted property; it involved the revaluation of previously included property. In the Tumulty case we upheld the taxpayer's contention that "the District of Columbia could not in November, 1933, assess personal property of the Company except for 'the then current year.'" But in the District of Columbia Revenue Act of 1937 Congress provided that "The taxes to which this title[7] relates shall be assessed within four years after such taxes became due * * *."[8] As amended on May 16, 1938, this section provides: "* * * In the case of a false or incorrect return, whether in good faith or otherwise, * * * or of a failure to include taxable property or assets belonging to the taxpayer in any return filed by such taxpayer, whether in good faith or otherwise, the tax may be assessed at any time * * *."[9]

If the items in dispute were otherwise taxable to petitioner, their assessment in

[2] D.C.Code, Tit. 20, Section 757.
[3] D.C.Code, Supp. III, Tit. 20, Section 970(7).
[4] Hormel v. Helvering, 61 S.Ct. 719, 85 L.Ed. —— (March 17, 1941).
[5] 69 App.D.C. 390, 102 F.2d 254, 256.
[6] 71 App.D.C. 143, 108 F.2d 10.
[7] Title 1, "Collection of personal property taxes"; 50 Stat. 673. This title imposes no taxes. It deals with "any return of personal property, tangible or intangible, for taxation or for the purpose of making a return where none has been made" (Sec. 1), and with the collection of "any personal property tax" (Sec. 2; cf. Sec. 6).

[8] 50 Stat. 673, 675, Tit. I, Sec. 8, D.C. Code, Supp. III, Tit. 20, Sec. 965.
[9] 52 Stat. 357, D.C.Code, Supp. V, Tit. 20, Sec. 965g.
"Return" is defined as "any return required to be filed by this title." D.C. Revenue Act of 1937, Tit. I, Sec. 11, as added by 52 Stat. 357, D.C.Code, Supp. V, Tit. 20, Sec. 965j, reads: "Any return required to be filed by said sections of this title." The "sections" referred to, 965 and 965k of the Code, comprise Title I of the Revenue Act of 1937, as amended.

1938 was clearly authorized by this statute.[10] The Supreme Court has held that a statute permitting assessment after the tax year applies, and is valid, with respect to tax years prior to its enactment. In Sturges v. Carter,[11] an Ohio taxpayer made incomplete returns of his intangible personal property for the years 1874 to 1877. During those years, Ohio law required that correction of returns and assessment of omitted property be made within the tax year. But in 1878, an Ohio statute was passed which provided that "the inquiry and corrections * * * may go as far back as the same can be traced, not exceeding the four years next prior to the year in which the inquiries and corrections are made." The state auditor thereupon assessed, for the years 1874 to 1877, the property which had been omitted from the returns of those years. The Supreme Court held that, since nothing in the statute required the auditor "to wait four years after its passage before he could give it full effect," these assessments were valid; and this despite the fact that the Constitution of Ohio forbade "retroactive laws." The taxpayer, the Court said, had no "vested right in the fruits of his false returns."[12] The present petitioner, accordingly, has no vested right in the fruits of incorrect or incomplete returns. The amendments of the Code in 1937 and 1938, and the new assessments under their authority, imposed no new taxes, but merely provided a new remedy "in addition to any other remedies available for the collection of said taxes."[13]

■ The District Revenue Act of 1937, as amended on May 16, 1938, provided that the business privilege tax "may be assessed by the assessor and collected by the collector of taxes of the District in the manner provided by law for the assessment and collection of taxes due the District on personal property in force at the time of such assessment and collection."[14]

Since assessments in August, 1938, were authorized, the Board of Tax Appeals had authority to "affirm, cancel, reduce, or increase" them.[15]

■ (2) *Taxation of a foreign cooperative.* Petitioner contends that as a cooperative marketing corporation incorporated elsewhere, with non-resident members, it is not subject to taxation by the District upon its intangible personal property. The applicable statute provides that: "The moneys and credits, including moneys loaned and invested, bonds and shares of stock * * * of any person, firm, association, or corporation resident or engaged in business within said District shall be scheduled and appraised in the manner provided by section 753 of this title for listing and appraisal of tangible personal property * * *."[16] As petitioner was incorporated in Maryland, its "legal residence" is there.[17] Petitioner nevertheless established its "commercial domicile" in the District, within the decision of the Supreme Court in Wheeling Steel Corp. v. Fox.[18] Moreover, the tax is laid not only on residents but also on those who are "engaged in business" in the District, and our decision in Hazen v. National Rifle Ass'n of America, Inc.,[19] is therefore controlling. The Rifle Association was a New York non-stock corporation organized to educate youth in marksmanship, to encourage the establishment of shooting ranges, and to prevent legislation adverse to the use of firearms. It urged that its aims were like those of a chamber of commerce, that it distributed no dividends, and that its funds came from the contributions of members, not from commercial relations with them or with the public.[20] We held that the tax statute was not limited to engaging in business for profit, and that the handling, in-

---

[10] In the Tumulty case the court had no occasion to consider the effect of this statute, as the assessments there involved were made before it was passed.

[11] 114 U.S. 511, 5 S.Ct. 1014, 1017, 29 L.Ed. 240. Cf. Butte & Superior Mining Co. v. McIntyre, 71 Mont. 254, 229 P. 730; Anderson v. Ritterbusch, 22 Okl. 761, 98 P. 1002.

[12] Sturges v. Carter, 114 U.S. 511, 517, 518, 5 S.Ct. 1014, 1017, 29 L.Ed. 240.

[13] 50 Stat. 675, D.C.Code, Supp. V, Tit. 20, Sec. 965h.

[14] 52 Stat. 363, 368, Sec. 11, D.C.Code, Supp. V, Tit. 20, Sec. 970j.

[15] 52 Stat. 371, Sec. 3, 53 Stat. 1109, D.C.Code, Supp. V, Tit. 20, Sec. 974.

[16] Act of Sept. 1, 1916, 39 Stat. 717, as amended, D.C.Code, Tit. 20, Sec. 754.

[17] Hazen v. National Rifle Ass'n of America, Inc., 69 App.D.C. 339, 344, 101 F.2d 432.

[18] 298 U.S. 193, 211, 56 S.Ct. 773, 80 L.Ed. 1143. This case is discussed below, in connection with the taxation of securities which petitioner kept in Virginia.

[19] 69 App.D.C. 339, 101 F.2d 432.

[20] 69 App.D.C. 339, 344, 101 F.2d 432.

vestment, and reinvestment of the Rifle Association's funds within the District constituted engaging in business here within the meaning of the statute. A fortiori the petitioner, which carried on commercial transactions here, engaged in business here.[21]

■ (3) *Taxation of accounts receivable.* Before 1935, payments for milk were made by the distributors to the producers, except one cent a gallon which was paid to petitioner. But during the years here in question, each distributor made his payments for milk not to the producers, but to the petitioner, on the 10th of each month, by a single check. About the 15th of each month, after deducting one cent a gallon and making other adjustments, petitioner made remittances to its members. On July 1st in each year, when tax liabilities became fixed, the distributors owed petitioner large amounts of money. These obligations have been assessed as its property. It claims that they did not belong to it but to its members, for whom it was a mere collecting agent.

The distributors contracted that they would "buy * * * from the Maryland and Virginia Milk Producers' Association, Inc." and would pay "directly to the Association." The Association contracted to "supply" the distributors, and to credit them for pasteurized cream returned by them. Petitioner's contracts of sale to the distributors do not suggest that petitioner acted as an agent for the producers.

Petitioner's contracts with the producers are somewhat ambiguous. They do not require the conclusion that petitioner was in fact an agent, though they do indicate that it may have thought itself an agent. The producers agreed to "consign" their milk and cream to petitioner. Petitioner agreed to sell it and either to "remit the proceeds thereof to the producer" or to "authorize the purchaser * * * to pay direct to the Producer"; less deductions, which might exceed one cent per gallon, for expenses, interest, overhead, depreciation, obligations, and reserves; and subject to "such fair and equitable differentials * * * as the Association may from time to time establish under uniform rules applicable to all other producers under like conditions all of which are hereby authorized, to the end that *the price received by each producer in each Market Area* and applicable thereto, which may differ one from another as prescribed by the Board of Directors from time to time, *shall be substantially uniform with that received by all other producers for milk and/or cream of the same quality* produced and marketed at the same time and place under substantially the same circumstances and conditions for the same Market Area." Petitioner agreed to "exercise its best efforts to sell at fair prices all the milk and/or cream produced by its members * * * and in event of inability to sell the same as fluid milk or cream to convert same into other dairy products and dispose of same and collect the proceeds and *distribute the net proceeds between the Producer and the other producer members of the Association in the same Market Area* in the manner herein contemplated and provided for by the constitution and by-laws, rules and regulations of the Association. * * * The Association *guarantees ultimate payment to the Producer at standard prices prevailing for the time being for each Market Area for like milk and/or cream produced, delivered and sold under like circumstances and conditions * * * for which such distributor or purchaser fails to pay * * * and guarantees the Producer against loss resulting through loss of market or failure of the Association to provide a market to the Producer for his output."* [22] Thus the amounts which petitioner paid to particular producers had no uniform relation to the amounts which petitioner received from distributors for the milk furnished by the particular producers. If the distributor who received milk furnished by a particular producer failed to pay for it, the loss was shared by all members. The contracts provided for specific performance, as well as damages, at the suit of petitioner, against a defaulting producer.

In the light of these facts we cannot say that the obligations of the distributors, which purported to belong to petitioner, really belonged not to it but to its individual members. In fact, it is hard to see what is meant by such a statement, for it is hard to see what incidents of ownership petitioner lacked or its individual members pos-

[21] Cf. Stanford University Book Store v. Helvering, 65 App.D.C. 364, 83 F.2d 710; The Army and Navy Club v. District of Columbia, 8 App.D.C. 544; Uniform Printing & Supply Co. v. Commissioner of Internal Revenue, 7 Cir., 33 F. 2d 445, certiorari denied, 280 U.S. 591, 50 S.Ct. 38, 74 L.Ed. 639.

[22] Italics supplied.

sessed. If it was only an agent, for whom was it an agent? The particular member whose milk went to a particular distributor had no greater economic interest than the other members in the sums which that distributor promised to pay to petitioner. As far as we can see, the particular member had no greater legal right than the other members in those sums. It follows that if the several obligations of the distributors were not owned by petitioner they must have been owned, not by the individual producers severally, but by all of them collectively. Such a view would treat the producers substantially as partners, ignoring the fact that the Association was not a partnership but an incorporated legal entity. It has been repeatedly held, in Maryland and elsewhere, that a cooperative corporation is an entity distinct from its members.[23] We see no more reason for asserting that all petitioner's individual members owned these accounts than for asserting that all the individual shareholders of a stock corporation own its accounts. Even when a cooperative association's contracts with its milk-producing members have been phrased clearly in terms of agency, it has been conceded that title to the milk passed to the association, and held that the association, and not the member, was the actual seller of the milk which the distributors bought.[24] We think the petitioner acted as a principal and owned the accounts receivable.

■ (4) *Business privilege tax.* The tax on "the privilege of engaging in business in the District of Columbia" for the fiscal year 1937-1938 was imposed in proportion to the "gross receipts * * * derived from such business for the calendar year 1936: *Provided, however,* That the tax imposed by this section shall be payable only upon the gross commissions of any person engaged in the business of a broker or agent, and shall not be payable upon the funds of his principal, of which he is a mere conduit." [25] It follows from what has been said that petitioner was not engaged in the business of a broker or agent, was not a mere conduit for the funds of a principal, and was rightly assessed on the basis of its gross receipts.

■ (5) *Taxation of stocks, bonds, bank deposits, etc.* There is no merit in the contention that petitioner was not the owner, but was a mere custodian, of its "revolving fund." Its bookkeeper testified that the revolving fund "is the net worth of the Association." Petitioner included in its original return $19,980 which it describes as "a portion of the revolving fund * * * then physically within the District of Columbia." It states that the entire fund is "held by the Board in the exercise of the discretion, lodged in it under the by-laws * * * and for 'a general corporate purpose of advantage to the Association'." Whether and when to distribute the fund, instead of continuing to use it for corporate purposes, is in the discretion of the directors. The Board of Tax Appeals found that the directors exercised their discretion as follows: "At the end, or at some other convenient part of the year, the amount of surplus, after payment of operating expenses, losses, bad debts and the like, was carried into the revolving fund. * * * The fund was invested in securities. If the securities purchased became valueless or depreciated in value such loss was spread over the fund for all the years, and was not charged against any one year, although the money with which such securities were purchased was produced in a certain year. The same was true in respect of gains in capital assets. In other words, there was no identity of funds for any particular year. "At the end of each year a certain sum, generally an amount equal to the amount of surplus carried into the revolving fund in the preceding sixth year was distributed to all who were producer members during such previous sixth year in proportion to the number of gallons of milk produced by them and sold by the Association. The amount so distributed did not always equal the amount so previously

[23] Rutledge Cooperative Ass'n, Inc., v. Baughman, 153 Md. 297, 304, 138 A. 29, 56 A.L.R. 1042; Parlett Cooperative, Inc., v. Tidewater Lines, Inc., 164 Md. 405, 165 A. 313; Texas Farm Bureau Cotton Ass'n v. Williams, 117 Tex. 218, 300 S.W. 44; Farmers Oil Co., Inc., v. State Tax Commission, 41 N.M. 693, 78 P.2d 816.

Some cases may be interpreted as disregarding the distinction. City of Owensboro v. Dark Tobacco Growers' Ass'n, 222 Ky. 164, 300 S.W. 350; Yakima Fruit Growers' Ass'n v. Henneford, 182 Wash. 437, 47 P.2d 831, 100 A.L.R. 435.

[24] People v. Shoemaker, 254 N.Y. 567, 173 N.E. 869, affirming 228 App.Div. 314, 239 N.Y.S. 71.

[25] Act of Aug. 17, 1937, 50 Stat. 688, 690, D.C.Code, Supp. III, Tit. 20, Sec. 970(5).

carried into the reserve fund, for instance, in 1929 the losses in capital assets purchased prior to that time were considerable, and such losses were spread over several years and were borne by the membership generally and without relation to the year in which was produced the money used to purchase the depreciated securities." Clearly the member's interest in the revolving fund does not ripen into ownership until the directors have determined what amount shall be allotted to him. In the meantime the fund is the corporation's property, and the member's interest in it is much like a stockholder's interest in the surplus of a stock corporation.[26]

Petitioner urges that even if it was the owner of the revolving fund, the securities in which the fund was chiefly invested were not subject to taxation in the District because petitioner is a Maryland corporation and the securities were kept in Virginia. Wheeling Steel Corp. v. Fox[27] refutes that contention. There the taxpayer, a Delaware corporation, had what was technically its "principal office" in Delaware, and its principal manufacturing plants in Ohio, but directed its business from an office in West Virginia. From that office it made deposits in, and withdrawals from, banks in various states. The Supreme Court held that the corporation had established a "commercial domicile" in West Virginia and could be taxed there on the money deposited elsewhere.[28] The securities involved here, like the deposits involved there, were used in the business conducted at the commercial domicile. These securities were a means by which petitioner carried out its contracts with its members.[29]

As the taxes here in question were imposed by Congress, cases[30] holding state taxation invalid as in derogation of the power of Congress are not in point. Various contentions of petitioner with regard to the validity of tax legislation for the District of Columbia are met by Neild v. District of Columbia.[31]

■ (6) *Amount of intangible property.* The evidence does not clearly support the Board's determination of the amount of petitioner's intangible property. Petitioner's bookkeeper, upon whose testimony the Board's findings must rest, stated that the "revolving fund" on July 1, 1935 was $444,007.72, on July 1, 1936, $526,181.48, and on July 1, 1937, $564,718.99. The Board assessed petitioner's "bonds, mortgages, stocks, etc." in exactly those amounts, and added assessments of accounts receivable from dealers, other accounts receivable, and petty cash. But the bookkeeper used the term "revolving fund" as synonymous with the "net worth of the Association." He excluded the major part, at least, of the accounts receivable, since he did not regard them as the property of the Association; but as far as appears he included petty cash and tangible property in the revolving fund. Accordingly the Board may have erred in making no deduction from the foregoing figures on account of tangible property, and in adding to them "petty cash." It is possible, also, that the Board's item "other accounts receivable" may have been wholly or partly included in the bookkeeper's "revolving fund" figures, which the Board adopted as the value of bonds, mortgages, stocks, etc., and may thus have been assessed twice. The case

26 Cf. Penn Mutual Life Insurance Company v. Lederer, 252 U.S. 523, 40 S. Ct. 397, 64 L.Ed. 698; Fruit Growers' Supply Co. v. Commissioner of Internal Revenue, 9 Cir., 56 F.2d 90; Farmers Union Co-op. Co. v. Commissioner of Internal Revenue, 8 Cir., 90 F.2d 488.

27 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143. Cf. Smith v. Ajax Pipe Line Co., 8 Cir., 87 F.2d 567, certiorari denied, 300 U.S. 677, 57 S.Ct. 670, 81 L.Ed. 882.

28 It is clear that one who is domiciled within a jurisdiction may be taxed there on his assets, including intangibles, though the evidence of the assets, such as a note or a certificate of stock, is kept elsewhere. Blodgett v. Silberman, 277 U. S. 1, 48 S.Ct. 410, 72 L.Ed. 749; Curry v. McCanless, 307 U.S. 357, 366-368, 59 S.Ct. 900, 83 L.Ed. 1339, 123 A.L.

R. 162; Pearson v. McGraw, 308 U.S. 313, 60 S.Ct. 211, 84 L.Ed. 293.

29 Petitioner does not contend that it is subjected to taxation elsewhere which duplicates the District tax. Moreover, "there are many circumstances in which more than one state may have jurisdiction to impose a tax and measure it by some or all of the taxpayer's intangibles." Curry v. McCanless, 307 U.S. 357, 368, 59 S.Ct. 900, 906, 83 L.Ed. 1339, 123 A. L.R. 162.

30 e. g. Alpha Portland Cement Co. v. Commonwealth of Massachusetts, 268 U. S. 203, 45 S.Ct. 477, 69 L.Ed. 916, 44 A. L.R. 1219; J. D. Adams Manufacturing Co. v. Storen, 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429.

31 71 App.D.C. 306, 110 F.2d 246.

must be remanded to the Board for such further proceedings as may be necessary to determine the extent of these errors, if any, and correct them.

Remanded for further proceedings.

GRONER, C. J. (dissenting in part).

I am unable to agree in so much of the opinion as holds petitioner liable for taxes assessed on "accounts receivable", or assessed on the entire "gross receipts" from sales for "the privilege of doing business in the District [of Columbia]."

Petitioner is a non-profit association of farmers incorporated under the "Co-operative Association" Laws of the State of Maryland, with its statutory principal office at Hyattsville, Maryland, and its operating office during the years in question in the City of Washington. All of petitioner's eleven hundred members are residents of Maryland, of Virginia, or of West Virginia, operating dairy farms in one or another of those States. All market their milk products through the association under uniform membership contracts, and only the products of members are marketed in this manner. The Maryland statute provides: "Any association organized under this Act, as agent to sell the products of members, may operate upon a non-profit basis by contracting to pay the members, for products sold by said members to or through the association, the resale price minus a uniform charge to cover the expenses in the handling of said products; resale price to be the actual resale price or to be based upon the average price during any period for products of the same type and quality; the uniform charge for expense to be specified in the contract or made otherwise ascertainable or left for determination by directors." Art. 23, Sec. 441.

The record shows that the business of petitioner was conducted in all respects in accordance with the laws of the State of its incorporation. Petitioner agreed to exercise its best efforts to sell at a fair price all the milk or cream produced by its members and to receive for its services a uniform deduction of one cent per gallon from the sales price to distributors. By the terms of its membership contracts petitioner guaranteed ultimate payment to the producer for milk delivered and sold to a distributor designated by petitioner and for which the distributor failed to pay. This guaranty was discharged out of a fund created by the deduction of one cent per gallon, which experience had shown was sufficient not only to pay operating expenses but also to pay any losses through defaulting vendees. What is left in the fund, after a fixed period of years, is returned to the producer in the proportion which the milk delivered by him bears to the whole amount received from all producers for the particular period.

The plan of distribution to milk distributors was that the farmer delivered his entire production of milk daily, as directed by petitioner, to a particular distributor and the distributor would pay petitioner on the 10th day of each month for the milk received the preceding month. Petitioner in turn remitted to the farmer on the 15th of the month for the milk furnished by him, less the one cent per gallon commission. For the years 1935, 1936, and 1937, the aggregate of uncollected accounts shown by the books of petitioner as of July 1 of each of those years (the taxable period) for milk delivered to distributors, was $1,153,923.51. Taxes amounting to $5,769.62 were assessed on this amount on the theory that these receivables were taxable assets of petitioner. The opinion sustains this assessment. In my judgment, these items were not then and never were the property of petitioner, but actually belonged to the farmer members, less only the one cent per gallon which petitioner could retain for expenses and the accumulation of its protective fund. I am, therefore, of opinion the assessment was erroneous. The question in this aspect of the case turns, as I think, upon the relation between the producing farmers and petitioner.

Did the farmer sell his milk to petitioner for resale, as to a merchant, or did he turn it over to petitioner for sale for his own account through the efforts of petitioner, as through a factor or broker?

The main opinion answers the question on the theory that petitioner in its business relations with its farmer members in the distribution of their milk acted as principal and as such owned the accounts receivable. But the record wholly fails to support this conclusion. The fact that the Washington distributors of milk made their contracts with petitioner without any mention of agency is, I think, immaterial. It is a rule of commercial law that an agent may sell goods of his principal in his own name. Slack v. Tucker & Co., 23 Wall. 321, 330, 23 L.Ed. 143; 22 Amer.Jur., Factors, Sec. 14. Although the relation between producers and association might not be strictly

within the ancient category of factor, nevertheless, in view of all the circumstances, especially the written marketing agreement described below, I think the manner in which the business was transacted brings the relationship clearly within that rule. The case of People v. Shoemaker, 228 App. Div. 314, 239 N.Y.S. 71, affirmed per curiam 254 N.Y. 567, 173 N.E. 869, on which the majority rely, is not in point. That case involved a penalty on a man for not registering as a purchaser of milk from producers, and the point was whether purchase from a co-operative was purchase from a producer, within the meaning of this penal provision. The New York court held it was not, because the purchaser customarily bought from the co-operative and dealt directly with it. The question involving the relation of the purchaser and the property interests of producers and co-operative, respectively, did not enter the case, as in the present controversy. In fact, the court could hardly have decided otherwise. Here the proceeds of the milk sold by petitioner both at law and by the custom of the business belonged to member producers, and the producer was legally entitled to the proceeds of sale. United States v. Villalonga, 23 Wall. 35, 23 L.Ed. 64. This is particularly the case here, because the member and the co-operative agreed that all milk produced by all members might where necessary be commingled and sold and the sales price collected by petitioner and the net proceeds accounted for according to quantity and quality as ascertained by certain established classifications. In such circumstances, there was no change of title or ownership. "The assignment would not in law transfer [title to] goods and merchandise entrusted to them, as factors, to sell". Chesterfield Mfg. Co. v. Dehon, 5 Pick., Mass., 7, 16 Am.Dec. 367. Nor is the rule changed by reason of the fact that petitioner guaranteed payment to the member-producer. Such a guaranty made petitioner a del credere agent. The fact of guaranty proves the agency relationship, for there would be no point in petitioner's guaranteeing its own obligations. If petitioner was buying milk rather than acting as agent or factor for its members, the obligation to pay would have been its own and the guaranty would have been meaningless. The

manner of operation or co-operation is more clearly disclosed in two instruments —petitioner's charter and the contract of membership. In neither is there any mention of title passing to petitioner. All members signed a "standard marketing agreement", in which the producer "agrees *to consign or to have consigned* to the association in accordance with its instructions" all milk or cream produced on farms operated by him during the continuance of the contract. The word "consign" does not mean sell, but does have a definite commercial meaning. In Sturm v. Boker, 150 U.S. 312, 326, 14 S.Ct. 99, 103, 37 L.Ed. 1093, the Supreme Court said: "It is too clear for discussion, or the citation of authorities, that the contract was not a sale of the goods by the defendants to Sturm. The terms and conditions under which the goods were delivered to him import only a consignment. The words 'consign' and 'consigned,' employed in the letters, were used in their commercial sense, which meant that the property was committed or intrusted to Sturm for care or sale, and did not, by any express or fair implication, mean the sale by the one, or purchase by the other."

Here there is every indication that the word was used in the sense referred to in the Sturm case. The agreement clearly points to the relation of factor or agent. It provides that the association shall sell or dispose of the milk. If the milk belonged to it, there would be no reason or necessity for promising anything with regard to its disposal. The agreement provides not only that petitioner shall sell, but shall sell milk *consigned* to it and shall remit the proceeds to the member on the 15th day of each month, less only the agreed commission. It clearly creates a del credere agency, and the proceeds of sales, in the form of accounts collectible on July 1, being the money of the producer as owner of the milk, is not property of petitioner and is therefore not taxable as intangible assets of petitioner. And for the same reason the gross proceeds of *all milk* sold for members in the year in question is not the basis on which taxes for license purposes may be assessed as "gross proceeds of operation". And this is obvious from the language of the business privilege tax section,* in which it is expressly provided that the license tax

* Sec. 970(5), Title 20, D.C.Code, Supp. III, in force at the time: "Provided, however, That the tax imposed by this section shall be payable only upon the gross com- missions of any person engaged in the business of a broker or agent, and shall not be payable upon the funds of his principal, of which he is a mere conduit."

shall be computed and be payable only, in the case of a broker or agent, upon gross commissions and shall not be taxable or payable upon funds of the principal of which the agent is the mere conduit. Here, if I am correct, the milk never having belonged to petitioner, its sale by petitioner with the obligation to pay the proceeds to the producer made it a "mere conduit" as to the sum so transmitted by it.

I am, therefore, of opinion that so much of the decision of the Board of Tax Appeals as found petitioner liable for taxes on account of receivables from dealers and so much as imposed taxes under the Business Privilege Tax Act on the entire gross proceeds of farmer-milk sold by petitioner in the year 1938, is erroneous and should be set aside and annulled.

I have not discussed the question whether petitioner's stocks and bonds comprising its "revolving fund" are taxable, but considering that petitioner is a Maryland corporation and its stocks and bonds were always outside the District of Columbia, and on my theory of the case were the property of the individual member-farmers and not petitioner, I have grave doubts whether any of these securities ever had a taxable situs in the District.