**COMMISSIONER OF INTERNAL REVENUE
v. SAN CARLOS MILLING CO.,
Limited.**

**No. 6914.**

Circuit Court of Appeals, Ninth Circuit.
Feb. 6, 1933.

Rehearing Denied March 13, 1933.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and Morton K. Rothschild, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, and John D. Foley, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for petitioner.

George E. Cleary, of New York City, for respondent.

Before WILBUR and SAWTELLE, Circuit Judges, and CAVANAH, District Judge.

SAWTELLE, Circuit Judge.

The taxpayer is a domestic corporation organized under the laws of the territory of Hawaii, with its principal office at Honolulu, T. H. Its principal place of business is in the municipality of San Carlos, province of Negros Occidental, Philippine Islands, where it operates a sugar mill for the manufacture of raw sugar from sugar cane, under a contract or contracts with certain planters who supply the sugar cane. These contracts will be discussed fully hereinafter. By the terms of the contracts, the taxpayer received as compensation for its milling services in the manufacture of the sugar 40 per cent. of the raw sugar manufactured from the cane supplied by the planters. The Commissioner of Internal Revenue determined that the sugar so received by the taxpayer under these contracts was income, because the contracts with the planters constituted a sale of the sugar to the taxpayer and therefore the taxpayer was not entitled to the benefits of section 262 (a) of the Revenue Act of 1921 (42 Stat. 271) in computing its tax for the year 1923. This determination was reversed by the Board of Tax Appeals (24 B. T. A. 1132), which held that the taxpayer was entitled to the benefits of section 262 (a) because the contracts constituted merely a bailment of the sugar and not a sale thereof. From this decision, the Commissioner has appealed.

The statute in question is as follows:

"Sec. 262. (a) That in the case of citizens of the United States or domestic corporations, satisfying the following conditions, gross income means only gross income from sources within the United States—

"(1) If 80 per centum or more of the gross income of such citizen or domestic corporation (computed without the benefit of this section) for the three-year period immediately preceding the close of the taxable year (or for such part of such period immediately preceding the close of such taxable year as may be applicable) was derived from sources within a possession of the United States; and

"(2) If, in the case of such corporation, 50 per centum or more of its gross income (computed without the benefit of this section) for such period or such part thereof was derived from the active conduct of a trade or business within a possession of the United States. * * * "

No question is raised as to the applicability of this statute if it be determined that the contracts between the taxpayer and the planters constituted a bailment of the sugar rather than a sale. If the milling contracts with the

planters constituted a bailment, the sugar received by the taxpayer as compensation for its milling services under the contracts was income received within a possession of the United States, and therefore entitled to the benefits or exemption of the statute; but, if the contracts constituted a sale of the sugar to the taxpayer rather than a bailment, then the proceeds from the sale thereof was not income derived from sources within a possession of the United States, but was income received in the United States, because practically all of the sugar was sold in the United States, and consequently the benefits of the statute could not be invoked.

■ The sole question for our consideration, therefore, is whether the intention of the taxpayer and the planters, as disclosed by the contract for the transfer of the sugar cane to the taxpayer to be manufactured into sugar, was to constitute the transaction a sale of the sugar to the taxpayer or merely a bailment thereof.

"Where articles are delivered by one person to another who is to perform labor upon them or to manufacture them into other articles for the former, the transaction is a bailment notwithstanding the articles are to be returned in altered form. But if the person by whom the articles are received may deliver in return articles which are not the product of those received the transaction is in effect a sale. So, where wheat is delivered to a miller to be ground and returned in the form of flour, the transaction constitutes a bailment, even, according to some authorities, though the flour returned is not to be ground from the identical wheat delivered; but where wheat is delivered to a miller to be paid for in flour, there is a sale. Likewise, where yarn is delivered to be paid for in cloth woven therefrom, it is a sale. But it has been held that a transaction is not converted into a sale by reason of the fact that the manufacturer is to receive a share in the manufactured article by way of compensation." 6 C. J. 1096.

■ "The substance of the agreement, and not its form or the particular expressions employed in it, is controlling, and the intention of the parties must be ascertained from the terms of their contract." Id., 1088.

■ With these rules in mind, we find that the following is substantially the agreement of the parties:

In 1911, Alfred D. Cooper, the taxpayer's agent in the Philippine Islands, entered into a contract with a number of planters in the Philippines to construct a sugar mill and maintain it for a period of thirty years, provided that the planters agreed to furnish the mill with a certain amount of sugar cane for a like period. This contract was later assigned to the taxpayer. Under the terms of the contract, the taxpayer agreed to construct and operate a railroad for use in transporting sugar cane, sugar, and fertilizer to the plantations of the growers free of charge to the planters. It also agreed to take delivery of all cane grown by the planters, properly loaded on cars at points along its railway, and to haul the cane free of charge to the mill. It agreed to supply the most approved modern means of weighing the sugar cane, and to have it accurately weighed, and issue to the owners of the cane weight certificates in due form. It agreed to crush, grind, and mill the sugar cane and manufacture the available sucrose contents of the sugar cane into merchantable sugar of certain grades. It agreed to furnish free of cost to the planters containers for the sugar. It agreed to deliver to each planter 60 per cent. of the sugar so made as computed from the weight and analysis of the sugar cane, or store the same at the planters' risk ninety days free of charge, making a reasonable charge for all sugar remaining in the warehouse for a longer period. The ownership of all sugar was to be represented by official warehouse receipts showing the number of bags of sugar and signed by a representative of the mill and the planter. It further agreed to deliver each week a statement for each plantation of the cane received and milled during the preceding week and a computation of the amount of sugar due each plantation. It was agreed that the mill would be operated regularly during the grinding season and maintained in good condition. The taxpayer further agreed that it would admit no planter to the milling contract at any future time on more favorable terms than those given at the time of signing the original agreement. It was agreed that "the mill will charge and accept as full compensation for the services rendered and agreed to be rendered hereunder forty per cent of the sugar and waste molasses manufactured as aforesaid, or, at the option of the mill, forty per cent of the net proceeds of sale of sugar manufactured, and of the waste molasses."

On the part of the planters, it was agreed that each planter would for a period of thirty years deliver to the mill all cane grown by him on lands which were generally designated and described in the contract. Delivery was to be made on cars of the mill's railroad. They agreed to furnish to the mill such a technical description of the plantation of each

planter as would be sufficient for inscription in the registry of deeds, which description was to be attached to the agreement and to become a part thereof. It was further agreed that, if at any time during the term of the agreement the planter should fail to plant three-fourths of his land or cultivate, harvest, or deliver his cane, the mill should at its option have the right to plant and cultivate or harvest the crop. The planter also agreed that the mill should have the right to enter its land and examine the crops during the term of the contract.

In accordance with their agreement, the planters devoted certain lands to the production of sugar cane, which was loaded on cars in the field. The loaded cars were then hauled by the planters to the railroad tracks of the taxpayer, where the taxpayer took delivery of the cars and had them hauled to its mill. The cane was weighed at the can track of the mill before unloading and a weight certificate issued for each planter's cane. The cane was then placed on the cane carrier and transported to the mill, where it was crushed, and a sample of the juice from each planter's cane was analyzed to determine the sucrose content or value, of which a separate record was made. Thereafter the juices were mixed in the further processes of manufacturing the sugar. It would not be commercially practicable to extract the sugar from each planter's cane separately.

The sugar was then weighed, bagged, and stored in the taxpayer's warehouse. Once each week the taxpayer computed the amount of sugar manufactured from each planter's cane from the weight of the cane, its sucrose content, and the efficiency of the mill, deducted the amount of sugar to which it was entitled as compensation for its milling services, and issued to the planter a warehouse receipt for his share of the sugar.[1]

_____

[1] The following is such a warehouse receipt:

"This certifies that there have been deposited by Gamboa Brothers in the warehouse above mentioned at the Company's place of business in San Carlos, Occidental Negros, P. I., the goods as described in detail in the left margin of this receipt, which goods will be delivered to the depositor or to his order duly endorsed upon this receipt, upon the presentation of the same and the payment of the storage and further charges applicable to said goods.

"Storage, at the rate of P0.17 per metric ton per month, commencing from ninety days from the date hereof will constitute a lien against the goods.

"Insurance, if it is desired, must be effected by the depositor or his transferee.

"The usual charges applying to rebagging, polarizing or weighing the sugar, in case said services or any of them are rendered, will be included in the lien in favor of this Company on the goods deposited.

"These goods constitute fungible things mixed with other things of equal class and grade."

The taxpayer always had on hand in its warehouse at San Carlos sufficient sugar manufactured at its mill to cover outstanding warehouse receipts. The taxpayer never paid any planter cash instead of returning to him his portion of the sugar; nor did it claim the right to sell for its own account all of the sugar produced under any of its milling contracts. The taxpayer has acted as selling agent for some planters, for which services it received a commission.

We cannot say that this agreement is inconsistent with the notion of a bailment. We believe that there is clearly manifested an intention on the part of the contracting parties that the transfer of the sugar cane to the mill should be governed by the legal relationship of bailor and bailee, and that their agreement cannot be construed to have the legal effect of a sale of the cane to the mill, nor was it so intended.

The principal contention of the Commissioner concerns the provision of the contract, hereinabove quoted, giving the taxpayer an option to accept as its compensation either 40 per cent. of the sugar manufactured or 40 per cent. of the proceeds from the sale of such sugar. It is contended that "the fact that the taxpayer had the right to pay the planter sugar or money seems to show conclusively that the transaction amounted to a sale." But it is quite clear from the language of the provision that this was not an option to pay the planters either sugar or cash for their sugar cane, but was an option permitting the taxpayer to charge either sugar or cash for its milling services. The contention advanced was well answered by the Board of Tax Appeals in its opinion, and with the conclusions therein expressed on this and other provisions of the contract we are in full accord. It is there said:

"The record supports the intent of the parties, as expressed in the contract, to compensate the petitioner for milling the cane into sugar by allowing the petitioner to retain 40 per cent of the sugar produced. During all of the years with which we are concerned the petitioner and the planters so construed their contracts and acted accordingly. As the petitioner points out on brief, 'It is significant that nowhere in the contracts are the terms "sale," "purchase," "selling price" or "purchase price" used, and that many of the provisions are inconsistent with an agreement of sale' of the cane to the petitioner as contended by the respondent. The provisions for weighing and crushing the planter's cane, the computation and delivery of the percentage

of sugar manufactured from his cane, and the storage of such sugar at the planter's risk, all negative the idea of a sale of the cane to the petitioner. The plain language of the contracts and the action of the parties show that these were milling contracts for the manufacture of sugar by the petitioner from the planter's cane and that the petitioner was to have a toll or share of the sugar manufactured as compensation for its services. Such provisions would have been wholly unnecessary had the parties to those contracts contemplated a sale of the cane to the petitioner. * * *

"The manner in which the planters or their representatives followed the processes through which the petitioner produced the sugar from the planters' cane, the handling of the manufactured sugar in the petitioner's warehouse, the issuance of warehouse receipts for the planters' share of the sugar, and the fact that petitioner always had on hand sufficient sugar to cover outstanding warehouse receipts, show that title to the cane and its produce remained in the planters. By agreement the planters consented to the commingling of the juices from their cane—a necessary incident to the commercial milling of sugar, and further consented to the storage of the manufactured sugar en masse in the petitioner's warehouse, their ownership of their proportionate share thereof being evidenced by warehouse receipts. As pointed out above, this commingling was not fatal to the planters' ownership of a proportionate part of the sugar. Thus, the practical interpretation of the agreement by the parties thereto, as evidenced by their actions thereunder, supports the petitioner's contention that the sugar it received was compensation for its milling services. * * *" 24 B. T. A. 1132.

Affirmed.