UNITED STATES v. MARKS et al.

No. 12680.

United States Court of Appeals
Ninth Circuit.

March 5, 1951.
Rehearing Denied May 15, 1951.

A. Devitt Vanech, Asst. Atty. Gen., Fred K. Deuel, Spc. Atty Dept. of Justice, Honolulu, T. H., John F. Cotter, Edmund B. Clark, Dept. of Justice, Washington, D. C., for appellant.

J. Garner Anthony, Frank D. Padgett Honolulu, T. H. (Robertson, Castle & Anthony, Honolulu, T. H., of counsel), for appellee.

Before HEALY and BONE, Circuit Judges, and GOODMAN, District Judge.

HEALY, Circuit Judge.

This is a suit for damages brought against the United States by the trustees of the estate of L. L. McCandless, deceased, under authority of Private Law 433, 80th Congress, approved June 29, 1948.[1] The damages claimed were in part for loss of livestock and other personal property occasioned by movements of Army personnel on the Island of Oahu following the attack on Pearl Harbor, and in part for the

---

1. "An Act To confer jurisdiction upon the District Court of the United States for the Territory of Hawaii to hear, determine, and render judgment on the claims

value of two unexpired leases of public lands on the Island cancelled at the government's instigation, assertedly without authority of law. The court awarded judgment on the claims in the amount of $65,-894.29, itemized as shown in the footnote.[2]

■ There are two questions for decision, (1) whether the livestock loss "arose out of the combat activities of military personnel of the United States" within the intendment of the proviso qualifying the first section of the Act; and (2) whether the lands embraced in the leases were subject to withdrawal for national purposes without liability to the lessee.[3] In our opinion, contrary to the holding below, both questions must be answered in the affirmative.

1. The leased lands, together with some adjoining parcels owned by the estate in fee, were operated as a cattle ranch. The terrain is largely rough and mountainous and the ranch fronts for a distance of several miles on the sea. Immediately after December 7, 1941, a small detachment of soldiers (increased a few days later to the number of 75) entered the property, erected gun emplacements, strung barbed wire on the beach, and patrolled the area inland. Necessary supplies for the activities were transported over trails by mule train, there being as of that time no roads.

Appellee Marks, the only important witness called for the plaintiffs on the immediate subject, said that he went to the ranch on December 17, this being his first visit.

of the executors and trustees of the estate of L. L. McCandless, deceased, as their interests may appear against the United States of America.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the District Court of the United States for the Territory of Hawaii to hear, determine, and render judgment upon the claims of the executors and trustees of the estate of L. L. McCandless, deceased, as their interests may appear, against the United States of America for damages, if any, but not exceeding the sum of $46,155, for the loss of personal property including the loss of livestock, alleged to have been caused by military personnel of the United States, and for damages, if any, but not exceeding the sum of $67,500 for the alleged illegal withdrawal of the Government lands covered by General Leases Numbers 1740 and 1741 of the Territory of Hawaii, each dated December 29, 1925, from the operation of those leases for use by the United States Army for war purposes: Provided, That judgment shall not be rendered against the United States with respect to any part of the alleged damages for the loss of personal property, including livestock, which arose out of the combat activities of military personnel of the United States.

"Sec. 2. Proceedings for the determination of these claims shall be had in the same manner as in cases against the United States of which the district courts of the United States have jurisdiction under the provisions of section 24 of the Judicial Code, as amended: Provided, that suit hereunder shall be instituted within one year after the enactment

of this Act; And provided further, That this Act shall be construed only to waive the immunity from suit of the Government of the United States and to confer jurisdiction upon said court to hear, determine, and render judgment upon the claims of the executors and trustees of the estate of L. L. McCandless, deceased, described in section 1 hereof, and not otherwise to affect any substantive rights of the parties."

2. "(a) 287 head of cattle lost........ $12,915.00
(b) Cost to plaintiffs of recovering stray cattle ................. 2,079.00
(c) 200 pigs ........................ 3,000.00
(d) 2 horses ........................ 250.00
(e) Loss of 500 bags, 400 bags of algaroba beans and 200 redwood posts..................... 190.00
(f) Value of General Leases 1740 and 1741 for 4¼ years ....... 41,460.29
(g) Rental value of house and guest cottage ................. 6,000.00

Total ........................ $65,894.29"

The government does not contest the award of $190.00 under item (e). Long prior to suit the Army offered to pay that amount for the property covered by the item. To that extent the award of damages will not be disturbed.

3. A third point argued will be disposed of summarily. The United States interposed a claim of partial setoff representing the cost of certain improvements it made on the Estate's fee land. The court found that the government failed to establish this setoff by a preponderance of the evidence. The finding is not clearly erroneous and must be accepted.

there subsequent to the Pearl Harbor attack. He testified that the troops were occupying most of the available houses. "They were busy putting up barbed wire entanglements. They had torn down fences and were using any available material that could be used in the creation of their defensive positions * * * there was an expediency [expectancy] of a landing down there, and they were taking all material that they could get hold of and every precaution that they could to be prepared for it." The loss or dispersal of the livestock appears already to have occurred, although the record elsewhere intimates that the process of recovering those that were repossessed continued over a long period. Asked what had happened to the cattle, Marks said they "just were dispersed." The 200 pigs "just were dispersed also * * *. They just disappeared is all * * *. A lot of them were shot." Two saddle horses escaped through a broken fence and were killed on a railroad track. As regards Marks' observation at that time of the condition of the fences, he said that they were down. "The wires had been cut." The watering system, too, had suffered. "The pipe lines taking water to the troughs had been cut. In two instances that I remember the troughs had been turned over, and in another instance where there was a permanent concrete watering trough a machine gun had been used to shoot the corner off of it. They seemed to think that mosquitoes were breeding in it."

It appears from other testimony that it was not until months later that the detachment on the ranch amounted to as much as a full company. In the following summer large numbers of troops were moved in, roads were built, and the area began to be employed as a training ground. In the period here important, however, that is to say, the time immediately subsequent to the bombing of Pearl Harbor, during which the loss and dispersal of the livestock appears to have occurred, the military activities on the ranch were confined to the erection of barbed wire entanglement and the guarding and patrolling of the beach. Colonel Fielder, who was in charge of military intelligence for the Islands, testified to the belief of the military that raids were possible "to say the least." He said, "An all-out invasion to capture the Islands seemed not too probable, but possible." There was, he said, "definitely anticipation of raids, agents being landed from submarines, air tights and the like."

The trial court found that the military personnel entering upon the premises on December 7, and causing the dispersal of plaintiffs' livestock through the destruction of fences and corrals, were not engaged in combat activities; and that the consequent loss did not arise out of combat activities. Appellees argue that these are findings of fact required to be accepted on appeal unless clearly erroneous. We are not able to agree. There was no dispute as to the time, the nature, or the purpose of the activities. The so-called findings reflect, rather, the court's interpretation of the term "combat activities" as used in the Act. [4]

In Johnson v. United States, 9 Cir., 170 F.2d 767, 770, this court construed the term "combatant activities" as employed in the Tort Claims Act, 28 U.S.C.A. §§ 1346, 271 et seq. The phrase was thought to "include not only physical violence, but activities both necessary to and in direct connection with actual hostilities. * * * The rational test would seem to lie in the degree of connectivity." In the Tort Claims Act the word employed is "combatant," while here it is "combat," but in each instance the word is used as an adjective. As so employed the terms appear to be synonymous. [5]

4. On this aspect, particularly, appellees stress the Report of the House Judiciary Committee accompanying the bill. The Report grew out of a subcommittee hearing at which only representatives of appellees appeared. We may note here a propensity in the Report to advise the court how the case should be decided. However, the court is obliged to apply the Act as it is written. Its terms are too plain to permit of recourse to extraneous evidence of the legislative intent.

See Webster's New International Dictionary, Second Edition, Unabridged.

During the period involved, as this court early recognized,[6] the situation in the Islands was one of gravest emergency. The troop movements here did not involve long-range defensive operations, nor were they activities remote in time or place from a zone of actual combat. They represented, rather, the instinctive reaction of the military to counter what was felt to be "an imminent" threat. The relation between the surprise attack on Pearl Harbor and the deployment of the troops was so immediate and imperative that they can not be regarded otherwise than as part of a single episode of warfare.

2. The leases, numbered 1740 and 1741, embraced an area totaling originally 4792.-72 acres. They were executed on behalf of the Territory by its Commissioner of Public Lands for a term of 21 years commencing December 29, 1925, in consideration of an annual rental of $1,410 and $1,-290, respectively. The original lessee was one Woods, who in March 1928 assigned the leases to McCandless. The lands covered were public lands title to which became vested in the United States through cession by the Republic as provided in the joint resolution of annexation of July 7, 1898, 30 Stat. 750. Each lease contained the following provision for withdrawal or cancellation at lessor's option: "It is mutually agreed, That at any time or times during the term of this lease, the land demised, or any part or parts thereof, may at the option of the Lessor, on behalf of the Territory of Hawaii, or any person or persons, corporation or corporations, be withdrawn from the operation of this lease for homestead or settlement purposes, or for storing, conserving, transporting and conveying water for any purpose, or for reclamation purposes, or for forestry purposes, or for telephone, telegraph, electric power, railway or roadway purposes, or for any public purpose, or for sale for any purpose for which land may be sold under the provisions of Section 73 of the Hawaiian Organic Act as now or hereafter amended [48 U.S.C.A. § 663 et seq.], and possession resumed by the Lessor, in which event the land so withdrawn shall cease to be subject to the terms, covenants and conditions of this lease, and the rent hereinabove reserved shall be reduced in proportion to the value of the part so withdrawn."

On July 2, 1942, the Commissioner, at the direction of Governor Poindexter, formally advised appellees that General Emmons had requested that certain areas of government lands in Oahu, including the acreage covered by Lease 1740, "be made immediately available to the Army for war purposes." The notification called attention to the clause providing for the withdrawal of the land when required "for any public purpose," and stated that the area covered "is hereby withdrawn * * * for use by the Army for war purposes." The lease was ordered cancelled as of June 29, 1942, "the date to which rent has been paid." Lease 1741 was similarly cancelled for use by the Army as of December 29, 1942, by notification given in July. The recitals of the notice were the same as above except for a statement that December 29 was fixed as the cancellation date because the rent had been paid to that time, and there was no provision in law for a refund.[7]

The trial court concluded that the government's occupancy of the leased lands "was without lawful authority and that the action of the Commissioner of Public Lands purporting to withdraw said leases for the use of military personnel did not constitute a withdrawal for public purposes of the Territory of Hawaii as provided in the Hawaiian Organic Act and the leases referred to and that plaintiffs are entitled to just compensation for the taking of said leaseholds." The award for the value of the leaseholds and the rental value of the houses thereon[8] for the unexpired portion of the term is predicated on this conclusion.

6. Zimmerman v. Walker, 9 Cir., 132 F.2d 442, 445, certiorari denied 319 U.S. 744, 63 S.Ct. 1027, 87 L.Ed. 1700.

7. The notice added that the Army requested immediate possession and asked that appellees sublease to the military for the intervening months. Apparently an arrangement of this sort was made and the Army reimbursed appellees for the advance rent they had paid.

8. By provision of the leases all improvements placed on the lands by the lessee

Before considering the arguments advanced in support of the holding it will be well to glance at § 91 of the Organic Act, which the court seems to have ignored. So far as here relevant the section reads: "Except as otherwise provided, the public property ceded and transferred to the United States by the Republic of Hawaii, under the joint resolution of annexation, approved July 7, 1898, numbered 55 (Thirtieth Statutes, page 750), shall remain in the possession, use, and control of the government of the Territory of Hawaii, and shall be maintained, managed, and cared for by it, at its own expense, until otherwise provided for by Congress, or taken for the uses and purposes of the United States by direction of the President or of the governor of Hawaii. * * " [9]

It is appellees' contention that the reserved power of taking for the use of the United States, as prescribed in this section, becomes inoperative as regards lands leased under authority of law. Such lands, they say, are excepted public property "otherwise provided for" by the Act. The argument revolves largely around the construction placed by appellees on § 73 (q) of the Organic Act as it existed in 1925 when these leases were made. The section is shown on the margin. [10] Appellees concede that under that section the Territory was empowered to withdraw leased lands

for public purposes of the territory, but they deny that any power of withdrawal was given for federal purposes. The contention is predicated on an amendment to the section made August 21, 1941. The amendment, it is said, was designed to authorize withdrawals for federal purposes, hence the legislation evidences congressional recognition of the fact that the power of withdrawal for such purposes had not previously existed. The amendment, we are told, can not be applied retroactively.

By this amendment, 55 Stat. 658, a clause was interpolated after the end of the third sentence in the section, reading as follows: "The provisions of this paragraph may also be applied where the 'public purposes' are the uses and purposes of the United States, and lands while so set aside may be managed as may be provided by the laws of the United States." 48 U.S.C.A. § 677. We regard the amendment as affording implications favorable only to the position taken by the government. The limited objective of the legislation clearly appears from both the House and the Senate Reports.[11] These state that "The purpose of the bill is to correct a technical defect in the Hawaiian Organic Act in order to give the Governor of Hawaii the same authority over public lands acquired since annexation that the Organic Act grants him

were to become the property of the lessor at termination.

9. Act approved April 30, 1900, 48 U.S.C. A. § 511.

10. "(q) All lands in the possession, use, and control of the Territory shall be managed by the commissioner of public lands, except such as shall be set aside for public purposes as hereinafter provided; all sales and other dispositions of such land shall be made by the commissioner or under his direction, for which purpose, if necessary, the land may be transferred to his department from any other department by direction of the governor, and all patents and deeds of such land shall issue from the office of the commissioner, who shall countersign the same and keep a record thereof. Lands conveyed to the Territory in exchange for other lands that are subject to the

land laws of Hawaii, as amended by this Act, shall, except as otherwise provided, have the same status and be subject to such laws as if they had previously been public lands of Hawaii. All orders setting aside lands for forest or other public purposes or withdrawing the same, shall be made by the governor, and lands while so set aside for such purposes may be managed as may be provided by the laws of the Territory. The commissioner is hereby authorized to perform any and all acts, prescribe forms of oaths, and, with the approval of the governor and said board, make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this section and the land laws of Hawaii into full force and effect." 48 U.S. C.A. § 677.

11. House Report No. 831, Senate Report No. 576, 77th Congress, 1st Session.

over the public domain comprised in the Territory at that time." [12]

■ As observed earlier, the lands here were public lands of the United States ceded upon annexation. Section 91 gave the Territory authority to "manage" such lands, and as part of its function of management it may lease them to private persons.[13] But leased lands remain subject to taking by the United States under § 91 of the Organic Act. This court so held in United States v. Chun Chin, 9 Cir., 150 F.2d 1016, 1017. The land there had been leased in 1936 for a term of 21 years. In 1940 the United States undertook to condemn several tracts for public use, and by inadvertence the leased parcel was included in the petition and declaration of taking, the Territory being listed as owner. In its answer the Territory pointed out that the parcel was public land subject to taking under § 91. Later, by an amended answer, the Territory set up the fact that the Governor had subsequent to the institution of the condemnation suit set the parcel aside for the use of the Navy. However, the trial court denied the government's motion to dismiss the parcel from the proceeding, and it awarded the lessee judgment for the value of his improvements. This court reversed, saying that "Condemnation was not an appropriate procedure since the rights of the United States as well as the method of asserting them have been prescribed by Congress in the organic law of the Territory." We did not pass upon the question of compensation for improvements, saying that such question was not in the case; but it is clear that the taking of public land under authority of § 91 is not

subject to the condition that compensation be paid, as in condemnation, for the unexpired portion of a term lease. Such a requirement would obviously be inconsistent with the power unconditionally reserved.

■ We turn now to the withdrawal clause embodied in the leases. Appellees contend, in harmony with the holding of the trial court, that the clause contemplates withdrawal of the lands for public purposes of the Territory, only. This, if true, is not determinative, since the provisions of § 91 of the Act must in any event be read into the contracts. However, apart from that consideration, we think the clause is broad enough to include withdrawal for the uses of the United States as well as of the Territory. It provides, among other things, that the demised land may "be withdrawn from the operation of this lease * * * for any public purpose." The provision should be read in light of the Territory's quasi-trustee relationship toward the paramount owner. The United States was no stranger to this property. Nor in considering the problem is it rational to divorce entirely the public purposes of the Territory from those of the United States. Often their interests are indistinguishable, as in a vital sense they were here.

■ Moreover there is significant evidence that in practice the lessee as well as the Territory treated the public purposes of the United States as being within the scope of the withdrawal provision. A formal communication addressed by the Commissioner of Public Lands to the lessee, McCandless, under date of January 16, 1929, was received in the record on the

12. The legislature of Hawaii had memoralized Congress on the subject. In the report contained in the Senate Journal of the territorial legislature it was stated: "The purpose of this concurrent resolution is to present a bill to Congress amending section 73 of the Organic Act so as to provide a method whereby lands acquired by the Territory after annexation may be set aside by the Governor for the uses and purposes of the United States. At the present time there is no provision in the Organic Act which covers this situation, as section 91 of the Organic Act only covers the setting aside

to the United States of the lands ceded upon annexation." Standing Committee Report No. 105, Senate Journal, Twenty-first Legislature of Hawaii, p. 350.

13. The fee title to such lands may be sold or disposed of by the Territory pursuant to homestead or other laws. Where title in fee is so parted with it is doubtless true that the land can be taken only through the process of condemnation and upon payment of "just compensation." By such disposition, of course, the land ceases to be public land and § 91 is no further operative.

trial. This notified McCandless of the withdrawal, pursuant to executive order, of two parcels of Lease No. 1740 for public purposes of the United States, "same being required by the War Department."[14] Long prior to the trial the trustees of the McCandless Estate had knowledge of the evidence relating to this transaction, but they made no effort to refute it, to minimize its significance or to explain it away. As the record stands the transaction evidences a practical construction of the leases by the parties themselves. The courts uniformly assume that the parties to an ambiguous contract are less liable than others to be mistaken as to its terms, that each is alert to protect his own interests and to insist on his rights. Accordingly the practice of the parties under a contract while their relations are harmonious is normally given controlling weight in matters of interpretation. The principle seems applicable here.

Except as to the item of $190 for the appropriation of bags, etc., as explained in note 2, supra, and except as to the government's claim of setoff disposed of in note 3, supra, the judgment of the district court is reversed. As to the items mentioned, it is affirmed.

14. Following is a copy of the communication:

"Jan. 16, 1929

"Mr. L. L. McCandless,
Honolulu, Hawaii
Dear Sir:

"I enclose blueprint showing in green two parcels of Government land at Makua, Waianae, Oahu, covered by your General Lease No. 1740, which are hereby withdrawn from the operation of said lease for public purposes, same being required by the War Department.

"These two parcels have a total area of 8.84 acres. On account of said withdrawal, a proportionate reduction in annual rental amounting to $5.50 will be made, effective on the next rental due date. The revised annual rental under this lease will be $1,404.50.

"Very truly yours,

"Ex. Or. 351     /i/  C.T.B.
                      C. T. Bailey
"CTB/O'S Commissioner of Public Lands.

|  | Area | Rent | Rate |
|---|---|---|---|
| "G. L. 1740 | 2275.0 | $1410.00 | $0.61978 per acre. |

"Withdrawn  8.84 ac. @ .61978 = $5.50 Bal. of Rent $1404.50

"Rent paid to June 29, 1929."