*J. Garner Anthony (Robertson, Castle & Anthony)* for petitioner Daniel S. C. Liu.

IN RE TAXES, AIEA DAIRY, LTD., CHARLES P. ANDERSON, AH HOW CHING AU (LUNALILO DAIRY), ABEL G. BRAZIL (BRAZIL DAIRY), ROBERT L. BROWN, HENRY COSTA, JR., ALFRED FERREIRA, ANTONE FERREIRA (WAIPAHU DAIRY), EDMUND S. FERREIRA, MANUEL FREITAS, RICHARD FREITAS, YASU FUJII, NOBORU FUJISUE, JOSEPH B. HILARIO, HYGIENIC DAIRY, LIMITED, GORDON K. ISHIKAWA (HAWAII LOA DAIRY), WALTER ISHIKAWA DAIRY, JOHN A. MEDEIROS, MOUNTAIN VIEW DAIRY, JOHN ORNELLAS, MICHAEL PESTANA, JR., ANTONE RUIS, JR. DBA LEHANO DAIRY, JOSEPH M. SALCEDO (KAIMI FARM), ABEL S. SANTOS (WAIKLOA DAIRY), EDWARD M. SHIMIZU, JAMES Y. SHIMIZU (PAHOA DAIRY), ROBERT M. SHIMIZU, ALFRED SOUZA DBA SOUZA BROS., J. D. SOUZA (HEEIA DAIRY), HENRY I. SUNG, JOE TEIXEIRA, JOHN S. TEIXEIRA, ANNIE H. TYAU DBA RED HILL DAIRY, WAIALAE NUI FARM, LTD., WAIALUA DAIRY, DAVID C. WONG DBA VALLEY VIEW FARM.

No. 4098.

FEBRUARY 25, 1963.

TSUKIYAMA, C.J., CASSIDY, WIRTZ, JJ., CIRCUIT JUDGE
TASHIRO, IN PLACE OF LEWIS, J., DISQUALIFIED,
AND CIRCUIT JUDGE KITAOKA, IN PLACE OF
MIZUHA, J., DISQUALIFIED.

OPINION OF THE COURT BY WIRTZ, J.

This matter arose out of assessments of general excise (gross income) taxes under R.L.H. 1945, Chapter 101 (now R.L.H. 1955, Chapter 117), the general excise tax law, for the period between November 1, 1954 and December 31, 1955, against a group of individual and corporate taxpayers, herein referred to as the "producers," who are engaged in the business of producing milk on the Island of Oahu and who are members of Dairymen's Milk Producers Association and market their milk, under contract, through the Dairymen's Association, Limited, herein referred to as the "distributor," and which is a wholly owned subsidiary of Beatrice Foods Company, a foreign corporation.

In 1954, a dispute arose between the producers and the distributor as to the amount of compensation payable to the distributor under the contract. Arbitration, as provided for by the contract, was resorted to with the producers and distributor each selecting an arbitrator, the third, in turn, being selected by the two representing the parties. On June 30, 1954, before the assessments in question, a unanimous decision was reached holding that the distributor, in addition to a fair return of 6% on in-

vestment, was entitled to greater compensation as their agent, based on sales rather than on volume "for its skill, knowledge, experience and supervision of the entire operation of receiving, processing and distribution of the products of the various independent producers." Thereafter, the contract was amended to reflect the increased commissions and to conform the same with the practice of the parties under their marketing arrangement.

During the tax period in question each milk producer contended that the distributor was "an agent selling the producers' products" and made no return of the milk produced and delivered to the company. The tax commissioner disallowed this contention and assessed such milk at the producing rate of $1\frac{1}{2}\%$ stating that "the individual producers are selling raw milk to the corporation [distributor], and the corporation [distributor] after processing, packing and other activities is reselling the milk in the form of milk products." The 36 separate tax appeals, by stipulation, were consolidated for hearing before the tax appeal court as they all were appeals from the assessment of the tax on the same type of income. By further stipulation they have been combined for purposes of the record on appeal to this court. At a pre-trial conference in the tax appeal court it was decided to determine the primary question whether the deliveries of milk to the distributor under the contract with the producers constituted sales of raw milk. The court below having concluded that such was the case affirmed the assessments from which this appeal has been brought to this court by the producers. The issue under this appeal is the same one presented to the tax appeal court and appellants' tax liability hinges on whether their dealings with the distributor constituted sales of raw milk.

As found by the court below, under the contract the producer agrees to deliver to the distributor all of its milk

and the distributor sets up a quota[1] for the producer. The producer can deliver over the quota of milk, but in such event there may be a difference in price. The distributor is then to market all of the milk and the milk that they are unable to market is then placed in surplus milk, considered as class 2 milk, and allocated to the producers through a formula. Roughly, the formula consists of a pooling of all of the milk and then a pooling of all of the money obtained for said milk. The various expenses of marketing the milk are then taken out of the moneys received by the company, together with a commission to the distributor of $3\frac{1}{2}\%$. The remainder is then paid to the various producers. In the event there is surplus milk, the distributor agrees to purchase the same up to a certain point. If there is additional milk, the distributor agrees to attempt to market it as well as possible. From the actual operations, there was never an occasion in which the distributor itself was not able to use all of the milk although occasionally some was left over from its retail sales and went to surplus milk. However, all risk of loss for spoilage and bad debts occurring in the sale of the milk through the so-called pool rested upon the producers, although they had no right to get any unsold milk back from the distributor or in fact to control any of the distributor's operations in the processing and sale of the milk other than to check the distributor's accounts and figures and to test their milk for butterfat content on delivery

---

[1] The quotas were established through production experience in the light of the available market. Thus, for all practical purposes, the producers were assured the highest return for the milk delivered within their quota and thus the quota had value, although under the contract there was no guarantee that even quota milk could be marketed as class 1 milk. The producers were, nonetheless, required to deliver all milk produced regardless of the quota, and the excess still might be marketed as class 1 milk even though over the quota. In the case of surplus or class 2 milk, the class 2 price was allocated first to the overquota production and then if all quota milk was not sold as class 1 milk then the class 2 price was allocated pro rata within the quota.

to check the determination by the distributor of the butterfat content at that time.

The court below found that, in practice, under the contract, the accounting procedure of the distributor was directed by the parent company, Beatrice Foods Company, and that it indicated a sale transaction rather than one of agency in the dealings between the producers and the distributor. Although the producers did check, and had an opportunity under the contract to check the various records of the distributor, they made no objection to the method of accounting. All money received for the sale of the milk by the distributor was mingled with other money belonging to the distributor and kept in one bank account and at the end of each month the producers were paid the respective amounts due them under the terms of the contract by the distributor from a computation made at that time. Once the milk was actually delivered to the distributor, it was mixed with milk from all the other producers, including milk from dairies of the distributor, processed and then sold. All billings were made on Dairymen's bill heads and presumably all collections were made in the name of Dairymen's Association, Limited.

It was also determined that while the producers had no control over the operation of the distributor in any manner other than as above indicated[2] to check the accounts and the butterfat content of the milk, the distributor did regulate the producers' operations to some extent in that the producers agreed to maintain a certain size herd of cows and could not, under the terms of the contract, cut down their operations more than a certain stip-

---

[2] The producers, through the Dairymen's Milk Producers Association, could and did meet with officials of the distributor to consider recommended suggestions for improved and more efficient operational methods to be utilized by the distributor in processing and distribution.

ulated percentage without permission of the distributor.

The decision of the tax appeal court dismissing the various appeals from the assessment is based upon four basic points. First, the tax appeal court took the position that the language in the introductory recital set forth in the contract indicated an intent to sell the milk to the distributor. This recital reads as follows:

"WHEREAS, the Producer is engaged in the business of producing milk on the Island of Oahu, Territory of Hawaii, and is desirous of selling and delivering its milk to the Distributor on the terms and conditions as hereinafter stated; * * *."

The second point relied on was that there was no provision in the contract for the return of the goods which it felt eliminated a bailment contract; the third was the accounting methods of the distributor, which were dictated by the parent company, Beatrice Foods Company, and last was the fact that there was no so-called control over the operations of the distributor by the producers.

The six specifications of error attack this decision based on the four grounds above set forth and point up the sole question of whether during the period covered by the assessments the taxpayer-producers' delivery of milk to the distributor constituted sales.

The intention of the parties to a contract is paramount to the manner chosen to effect it. The courts of Hawaii have long followed this axiom that the intention of the parties governs the meaning of legal instruments in the construction of contracts. *Lathrop* v. *Wood,* 1 Haw. 121. Corollary to this, the contract must be construed in its entirety. *Hawaiian Pineapple Co.* v. *Saito,* 24 Haw. 787; *Thompson* v. *Halawa Sugar Co.,* 6 Haw. 464.

Although the preliminary recital in the contract, upon which the tax appeal court relied, contains a statement

which seemingly indicates a sale, the true and ultimate intent of the parties must be determined by a consideration of the contract as a whole.

The following provisions appearing in the original contract are indicative of an agency or consignment relationship: Throughout the operative parts of the contract the parties are characterized as "producer" and "distributor" rather than "seller" and "purchaser" or "vendor" and "vendee;" the surplus milk is to be disposed of "for the account of Producer;" under pool credits "the pool shall be credited with the net proceeds from sales of all products purchased for the account of the pool," while under pool debits reference is made to commissions payable to the distributor "for the account of the pool."

The distributor will "receive all milk * * * which is delivered to it by the Producer" and is obliged to sell and dispose of the milk and milk products "to the extent that it can sell the same on the existing markets." This language indicates that the distributor will do its best to market the producers' milk but at no time prior to such sale does the distributor ever become obligated for the proceeds, and then only for the cash receipts. This denotes nothing more than a consignment for sale. The distributor is merely a bailee for the purposes of the agency. As found by the tax appeal court, which finding is uncontested under this appeal, the contract provisions spell out that the risk of loss falls entirely on the producers or at least until such time as milk has been allocated to surplus, at which point a sale as to such surplus milk from the producer to the distributor could occur. This risk not only attached to the product but followed through to the accounts receivable of the distributor resulting from the sale of the product.

The original contract was amended to conform to the actual practice of the parties under the original contract,

which had been determined to create an agency relationship in the arbitration hearing in 1954 before the present assessments were made. These amendments strengthened the accepted interpretation of an agency relationship by: providing a credit to the pool of proceeds from the sale through the distributor's milk plant facilities of "all milk products (including Class 1, Surplus and Golden Guernsey Premium milk) processed at Distributor's milk plant;" providing a debit against the pool for "all expenses incurred in the purchasing, receipt, processing, distribution and sale of all products for the account of the pool;" by describing the compensation received by the distributor for its services under the contract as a "commission;" by providing "in the event the Distributor is unable to use all of the Surplus Milk of the pool as replacement for mainland butterfat and/or milk solids, then the Distributor shall use its best efforts to otherwise dispose of the same at the best available price therefor and shall credit the pool therefor at such price."

The fact that the distributor agrees that "payments to be made for milk received from Producer and accepted by Distributor during the preceding month will be credited to Producer's account" is as equally indicative of an agency relationship as it is of a sale.

Construed in its entirety the contract evidences an intention of the parties to create an agency relationship, specifically a consignment for sale. The courts consistently will look through the wording and phraseology used in a contract to ascertain the true intent. See *Greenwood Mfg. Co. v. Worley*, 222 S.C. 156, 71 S.E.2d 889.

In this regard the case of *Irvine Co. v. McColgan*, 26 Cal. 2d 160, 157 P.2d 847, contains an excellent statement at page 850: "It is generally recognized that there are two kinds of cooperative marketing agreements, sales and agency, and that the determination of whether a

particular agreement is to be classified as one or the other depends upon the intention of the parties thereto."

The tax commissioner relies strongly on the use of the word "price"[3] throughout the contract as connoting a sale rather than a bailment. But it is notable that even in cases where the language of the contract was couched in terms of "price" and "sale," the courts have ignored the literal meaning of those terms and ascertained, from the contract as a whole, that the true intent of the parties was to establish the relationship of agency rather than that of sale. *Texas Certified Cottonseed Breeders' Ass'n* v. *Aldridge,* 122 Tex. 464, 61 S.W.2d 79; *Bowles* v. *Inland Empire Dairy Ass'n* (E. D. Wash. 1943), 53 F. Supp. 210; see also *Spencer Co-operative Live Stock Shipping Ass'n* v. *Schultz,* 209 Wis. 344, 245 N.W. 99; *Haarparinne* v. *Butter Hill Fruit Growers Ass'n,* 122 Me. 138, 119 Atl. 116; *Poultry Producers of Southern California* v. *Barlow,* 189 Cal. 278, 208 Pac. 93.

In *City of Owensboro* v. *Dark Tobacco Growers' Ass'n,* 222 Ky. 164, 300 S.W. 350, the city assessed tobacco in defendant association's warehouses. Defendant contended that the tobacco was exempt from taxation under the provisions of a statute which exempted unmanufactured agricultural products in the hands of the producer or in the hands of any agent or agency of the producer to which said products have been conveyed or assigned for the purposes of sale by the producer. Under a provision of the agreement between the association and grower, the association agreed to buy and the grower agreed to sell. In deciding that this agreement created an agency relationship despite the language of sale, the court stated at page 352:

---

[3] As used in the contract the term "price," in some instances, refers to net proceeds from sale of the product to the public after application of pool credits and debits, and in other instances, to comparative market prices of milk or milk products other than those covered by the contract.

"In determining whether an agreement between parties is a sale or whether it is a mere contract of agency, isolated expressions in the instrument indicating whether it is one or the other are not necessarily controlling; on the contrary the courts will ignore apparently inconsistent language used, and look to the real nature of the agreement between the parties, what its real purpose was, and what, from the nature of the transaction, must have been in the minds of the parties."

In the case of *Department of Treasury* v. *Ice Service, Inc.*, 220 Ind. 64, 41 N.E.2d 201, the Ice Service Company brought suit against the Treasury Department of Indiana to recover taxes on proceeds the plaintiff received. The plaintiff was a corporation set up to sell and distribute ice manufactured by four ice producing companies. Each of the four companies had a quota and each was to share in the distribution of proceeds in proportion to its respective quota. Plaintiff claimed it was an agent, while the tax authority pointed to numerous factors to support its position that no such agency existed. The Supreme Court of Indiana agreed with the plaintiff, concluding that creation of an agency relationship depends upon the intention of the parties.

The tax commissioner contends that the agricultural cooperative cases are inapplicable inasmuch as the producers herein have not chosen to comply with the cooperative marketing statute of Hawaii. While it certainly would be easier, as indicated in some of the above cases where cooperatives were involved, to find in the instant case an agency agreement had they set up a cooperative under the Hawaii statute, it does not follow that they are therefore precluded from entering into an agency agreement. While the contract relations of the producers with the distributor were individual in effect since they

all belonged to a dairy producers association, their relationship with the distributor was very similar to that of a cooperative, excepting the mere fact that they had no interest in or control of the operations of the distributor. The cooperative cases hereinabove considered, while they place considerable reliance on the cooperative structure of the relationship and necessarily give such great weight, nonetheless, examined the marketing agreements in each case on the basis of determining the intent of the parties. Pool marketing has as its principal object the regulation of supply and price of commodities. *Georgia Fruit Exchange* v. *Turnipseed,* 9 Ala. App. 123, 62 So. 542; *Burch* v. *South Carolina Cotton Growers' Co-op. Ass'n,* 181 S.C. 295, 187 S.E. 422. A marketing pool accomplishes this purpose whether it be through the agency of an agricultural cooperative or a profit-making corporation.

The cooperative feature undoubtedly gives rise to a presumption of an agency relationship, but as stated in 46 Am. Jur., *Sales,* § 17 at page 211:

"The primary test of whether a particular contract or transaction whereby goods are delivered or shipped by one party to another for sale by the latter creates the relation of buyer and seller or only a relation of principal and agent is the intention of the parties to be gathered from the whole scope and effect of the language used, and mere verbal formulas, if inconsistent with the real intention, are to be disregarded. It does not matter by what name the parties chose to designate it. That does not determine its character. The courts look beyond mere names and within to see the real nature of the agreement, and determine from all its provisions taken together, and not from the name that has been given to it by the parties, or from some isolated provision, its legal character and effect."
In *Nelson* v. *Guaranty Trust Co.* (9th Cir.), 60 F.2d

463, strongly relied on by the tax commissioner, the court, having found that "the basic principle of this pooling plan is identical with that of co-operative marketing," nonetheless looked at the whole contract for the intent of the parties and determined that a sale had occurred as "fundamentally back of this marketing idea is the necessity of the marketing instrumentality's being able to finance the growers to a large extent during the growing season, * * *." Such was not the case here. But the *Nelson* case illustrates the principle that the use of the cooperative marketing structure is, of itself, not decisive of the issue of sale or agency.

Moreover, mercantile terms in mercantile contracts are given the meaning merchants ordinarily give them. *The Kronprinzessin Cecilie,* 244 U.S. 12; Restatement, Contracts, § 235 (b). For example, "commission" is usually taken to mean "compensation allowed to agents, factors, executors, trustees, receivers, and other persons who manage the affairs of others, in recompense for their services." 1 Bouvier, Law Dictionary (8th Ed. 1914) 548; *Weiner* v. *Swales,* 217 Md. 123, 141 A.2d 749; *Sunderland* v. *Day,* 12 Ill. 2d 50, 145 N.E.2d 39; *Krause* v. *Boraks,* 341 Mich. 149, 67 N.W.2d 202.

Despite the foregoing, the tax court seems to have placed undue reliance on the recital as indicating the intent of the parties. However, the recital at best is of limited probative value. As stated in the Restatement of the law of Contracts (1932), § 244: "* * * a mere recital in an integration of any fact may be shown to be untrue, and the actual facts have the same operation as if stated in the integration."

The recital can hardly be ignored but it is not, strictly speaking, a part of the contract unless specifically adopted by reference. *Berg* v. *Berg,* 201 Minn. 179, 275 N.W. 836; *Ross* v. *Ross,* 233 App. Div. 626, 253 N. Y. Supp. 871;

*Martin* v. *Rothwell,* 81 W. Va. 681, 95 S.E. 189. It is the operative part of an agreement and not mere recitals therein which determines what the parties actually intended by entering into the agreement. *Pulaski* v. *Riland,* 199 Md. 426, 86 A.2d 907. Here, the recital is negated by the operative provisions of the contract as well as the uniform and accepted practice of the parties thereto. The recital cannot be made the basis of a legal and binding obligation between the parties. *Berg* v. *Berg, supra.* It was not adopted by reference in the contract and consequently was not a part thereof.

*Wilson* v. *Towers* (4th Cir.), 55 F.2d 199, is the sole case cited by the tax commissioner in support of construing the recital with the contract. This case states as a general rule that " 'if the recitals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous, and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part is to be preferred.' " But, the court then goes on to point out at page 200 that:

> "It is contended * * * that, reading the contract as a whole, and construing the 'whereas' or recital clauses with the operative or agreement clause, the contract binds the power company to purchase all the current needed * * * from the railroad company. The rules of construction contended for * * * apply only where there is an existing ambiguity, but they will not be applied to create uncertainty."

As already seen, we do not find the operative provisions of this contract to be ambiguous. Any uncertainty created by the recital is dissipated by the clearly expressed intention of the parties in the operative part of the contract showing the recital to be erroneous. Restatement, Contracts, § 244, *supra.*

However, in the eyes of the tax appeal court "the contract carries various provisions which could be either in a sale or an agency contract," or in other words it was equivocal and consequently ambiguous. Under this view, apart from the presumption favoring a bailment rather than a sale in cases of doubt (*Irwin* v. *Pacific Fruit & Produce Co.*, 188 Wash. 572, 63 P.2d 382; *Dryden* v. *Michigan State Industries* (8th Cir.), 66 F.2d 950), the interpretation given by the parties to the instrument would be controlling to the exclusion of the recital. Restatement, Contracts (1932), § 235(e); Williston, Contracts (1936), § 623. Where an ambiguous contract has been construed by the parties, the interpretation adopted by them governs. *Lowrey* v. *Hawaii*, 206 U.S. 206; *United States* v. *Marks* (9th Cir.), 187 F.2d 724, *cert. denied*, 342 U.S. 823; *Thompson* v. *Halawa Sugar Co., supra*, 6 Haw. 464; *Wood* v. *Ladd*, 1 Haw. 23 (17). If the contract is uncertain as to agency, it is equally uncertain as to sale. The subsequent actions of the parties in construing the contract cannot be ignored as evidencing the intent of the parties under the contract.

As stated in *Metropolitan National Bank* v. *Benedict Co.*, 74 Fed. 182, 185:

"Moreover, parties have the undoubted right to make their own contracts, and to put their own construction upon them, and to regulate their rights and liabilities thereunder. If the court 'leaves the parties to be governed by their understanding of their own language, it, in effect, enforces the contract as actually made. That they should be so permitted to construe their own agreement accords with every principle of reason and justice.' "

The arbitration proceedings, under the contract resulting in the decision of June 30, 1954, had probative value, as unlike *Re Century Metalcraft Corp.*, 41 Haw. 508, 524,

cited by the tax commissioner, it represented the understanding of the parties to the contract, rather than ex parte interpretations made out of the jurisdiction by strangers to the contract involving different parties although similarly situated.

The tax commissioner, in essence, contends that while the obligation to restore specific things constitutes a bailment, a power or necessity of returning things equal in value contemplates a debt. This contention cannot be literally accepted. Where the producers transfer possession of their milk to the distributor, instructing the distributor to sell the milk and return the proceeds thereof to the producers, the distributor is simply an agent or bailee. Williston, *Sales* (1948), § 338, pp. 303, 304. *Cf., Commissioner of Int. Rev.* v. *San Carlos Milling Co.* (9th Cir.), 63 F.2d 153.

What seems to be overlooked in considering the application of the usual principles of bailment to the instant situation is the nature of the product being marketed. Milk is a highly perishable commodity. The producers do not have the facilities to keep and store milk while the distributor does have such facilities. It is the principal object of the contract for the producers to hire the facilities and services of the distributor, as a convenience to them rather than carry through separately the total operation of production, processing, distribution and sale. It is natural and logical that the parties might intend no return of the milk if the milk no longer has any value. No return is contemplated in the marketing of perishable agricultural products, yet a commercial agent is no less a bailee for "dumping" rather than returning such goods to the producers. See R.L.H. 1945, § 1312.07, S.L. 1951 (now R.L.H. 1955, § 23-7).

It does not follow that since the contract had no provision for the return of unsold milk that this makes the

transaction a sale. An agency relationship may be entered into without such a provision, and due to the perishable nature of the product involved there would be no reason for such a provision in these contracts. It should be borne in mind that if unsold milk was retained for any appreciable time, it would spoil and the risk in such case, as found by the tax appeal court, would be clearly on the producers.

In *Texas Certified Cottonseed Breeders' Ass'n* v. *Aldridge, supra,* 122 Tex. 464, 61 S.W.2d 79, no reference was made to any provision calling for the return of any unsold seed to the grower, yet the court found no difficulty in holding the contract to be one of agency even in the light of language couched in terms of sale and purchase.

In *City of Owensboro* v. *Dark Tobacco Growers' Ass'n, supra,* 222 Ky. 164, 300 S.W. 350, various provisions in the agreement are discussed by the court but no mention was made of any provision for the return of unsold tobacco to the grower, yet the court found the contract to be one of agency in spite of language to the effect that the association agreed to buy and the grower agreed to sell to the association.

Further, even though no return was contemplated, a transaction may be a consignment for sale up to a certain period of time, and then become a sale by reason of the consignee's duty to pay for the goods then on hand. *McKenzie* v. *Roper Wholesale Grocery Co.,* 9 Ga. App. 185, 70 S.E. 981; *In re Pierce* (8th Cir.), 157 Fed. 757; *In re Galt* (7th Cir.), 120 Fed. 64; *Martin* v. *Stratton-White Co.,* 1 Indian Terr. 394, 37 S.W. 833; *Norton* v. *Fisher,* 113 Iowa 595, 85 N.W. 801; *Norton* v. *Melick,* 97 Iowa 564, 66 N.W. 780. In finding that a consignment is not converted to a sale because the bailee had an option to purchase, the court in *Federal Rubber Co.* v. *King,* 12 Ga. App. 261, 76 S.E. 1083, 1085, stated that "the whole

question is whether the ostensible purchaser assumes liability for the purchase price at the time the goods are received, * * *." Under the contract here the distributor did not assume any liability at the time of delivery, but only became liable for any milk in the event the producers at the end of each month required it to buy the surplus milk.[4] This contingency never arose because no portion of the milk so consigned was ever in fact allocated to surplus. The only possible sale of milk by the producers to the distributor was that of surplus milk, and this was at the producers' option. It should be clear, however, that the rest of the milk, that is, the milk not allocated to surplus, never becomes the property of the distributor. R.L.H. 1945, § 9222 (now R.L.H. 1955, § 202-22). *Cf., Edgewood Shoe Factories* v. *Stewart* (5th Cir.), 107 F.2d 123; *Riedinger* v. *Mack Machine Co. of Harrison,* 117 N. J. Eq. 334, 175 Atl. 790; *In re Renfro-Wadenstein* (9th Cir.), 53 F.2d 834.

The tax appeal court in its decision also pointed to the fact that the producers exercised no control over the operations of the distributor as indicative of a sales relationship. It is, however, obvious that an owner can surrender control over his product to an agent as the producers have done here to facilitate the sale of the property without thereby destroying the agency relationship.

---

[4] The tax commissioner relies on *Interborough News Co.* v. *McGoldrick,* 283 N.Y. 49, 27 N.E.2d 428, for the proposition that where the taxpayer, under the same contract, receives products for resale as a retailer as well as for distribution on commission to other retailers as a wholesaler, this fact negates the creation of an agency agreement, in the absence of the contract specifying the dual nature. In the instant case, the dual nature is ascertainable from the contract. Further, the New York tax laws involved "presumed that all receipts are subject to the tax until the contrary is established, and the burden of proving that any payment or consideration received by any person subject to the tax hereby imposed was not received in, or by reason of a sale made or service rendered or transaction had in the city of New York shall be upon the person who received it." No such presumption, or burden of proof on the taxpayer, confronts us in the instant case.

Such is clearly recognized in the law of agency dealing with undisclosed principals. Speaking of control over one's product with regard to an agency relationship, the Supreme Court of Texas had this to say in *Texas Certified Cottonseed Breeders' Ass'n* v. *Aldridge, supra,* 122 Tex. 464, 61 S.W.2d 79, at page 83:

"By the terms of the contract the grower has surrendered control over the sale of his product, and thereby to this extent has divested himself of an important element of ownership. The contract upon this point is clothed in the terminology of a sale. The relation of consignor and factor has been abandoned. The logical and practical object of the members, as expressed in the contract, is to clothe the transaction in the language of a sale for the purpose of permitting the exercise of all powers named in the contract rather than a consignment in order to enable the association to enter bona fide transactions free from the embarrassment arising out of an incomplete title. * * *

"The members of the association, in order to promote their welfare, delivered their seed to the association. They constituted the association their agent with broad and exclusive powers to handle and sell their commodity. This was necessary to accomplish the very purposes for which it was created. It being the clear intention of the members to create a true co-operative marketing association, under the powers enumerated by law and by the contracts, to perform certain services exclusively for its members, and to hold in the face of this intention that the delivery of the seed to the association was an absolute sale would destroy it as a co-operative marketing association."

It is seen that control exercised by an agent over the principal's product does not necessarily convert the transaction into a sale.

The tax appeal court also found that the accounting procedures used by the distributor were indicative of a sale. First of all, it is of no concern to the producers how the distributor kept its own books. The fact that the producers had an opportunity under the terms of the contract to check the records of the distributor, which would seem to be a novel right to accord a vendor in the usual sales transactions, and made no objection to the particular method of accounting which was being utilized is not binding on the producers. *Sturm* v. *Boker,* 150 U.S. 312. Furthermore, it was to the producers' advantage that the distributor use the most economical accounting procedures as possible because the producers eventually bore their pro rata share of these costs. See *Department of Treasury* v. *Ice Service, Inc., supra,* 220 Ind. 64, 41 N.E.2d 201, where the taxing authority argued that the fact that the plaintiff made federal income tax returns in which it reported receipts from the sale of ice under the item "Costs of Goods Sold" and similar amounts under the item "Material or Merchandise Bought for Manufacture or Sale," conclusively showed that the plaintiff believed it was buying the ice from the manufacturer and selling it for its own account and not as agent. This contention was rejected by the Supreme Court of Indiana, which nonetheless held the transaction established an agency relationship.

Finally, the tax appeal court finds as an additional reason to buttress its decision the fact that all the milk is commingled. The complete answer to this is that the very nature of a cooperative marketing agreement contemplates the commingling of the products involved. In this connection, in the case of *Department of Treasury* v. *Ice Service, Inc., supra,* 220 Ind. 64, 41 N.E.2d 201, the taxing authority advanced the argument that, because the ice of the four manufacturing companies was commingled and because the plaintiff did not account to each of the

manufacturing companies for the proceeds of the sale of the particular ice furnished by such manufacturing company, but only distributed the proceeds on the basis of the proportionate share of the ice furnished by the four companies, this fact conclusively showed the plaintiff did not sell the ice as an agent. In answer to this the court said at page 203:

"We see no reason why the four companies and the appellee [plaintiff] could not agree that the ice manufactured by the four manufacturing companies should be furnished by said four companies annually proportionately to the business each had done during the years covered by the audit, nor why the ice so furnished should not be commingled in a general pool, sold from such general pool by the agent and the proceeds accounted for by the agent, periodically, on the basis of the proportion of ice furnished by each of the four manufacturing companies. It was not necessary that the ice of the four companies be kept separate or that the proceeds of each sale made by the appellee [plaintiff] be accounted for to the company which furnished the ice for that particular sale."

See also in this connection *Dryden* v. *Michigan State Industries* (8th Cir.), 66 F.2d 950, 954; *McCallum* v. *Bray-Robinson Clothing Co.* (6th Cir.), 24 F.2d 35, 37; *In re Klein* (2d Cir.), 3 F.2d 375, 379; *Commissioner of Int. Rev.* v. *San Carlos Milling Co., supra,* (9th Cir.), 63 F.2d 153.

The tax commissioner's basic legal argument is that "the commingling of fungible goods in a continuous stream fed from many sources" causes title to pass to the person from whom these goods are delivered. In other words, if goods or proceeds are to be commingled, a sale occurs on delivery. This contention has no merit. The fact that the milk of each producer and the proceeds from

the sale thereof are commingled in a pool and pool account is not determinative of a sale. The fact of commingling does not preclude the existence of an agency relationship. Restatement, Agency 2d (1958), § 398, comment c; 2 Williston, *Sales,* (1948), § 338. As in all contractural relationships, the intention of the parties is controlling. We do not hold that a pooling arrangement can never result in a sale. Rather the intention of the parties as gathered from the whole of the contract and the surrounding circumstances and the construction given by the parties themselves determines the effect of the contract. It is this intention and not any artificial rule on commingling which governs the question of agency.

As contended by the tax commissioner, title to the property and proceeds of sale are decisive. The contract here involved, however, manifests no intent to pass the property in the milk to the distributor except for surplus or class 2 milk. The distributor is a mere conduit through which title passes from the producers to the consumer. Until there has been an allocation to surplus, risk of loss is borne by the producers.

The tax commissioner has concluded that the producers do not have the risk of loss simply because they bear losses collectively. He argues that "in any event, the individual producer did not have the risk of loss after delivery. Instead the losses as well as the profits were averaged in determining 'Class 1' paying price." This can only mean that no one had the risk of loss. As seen by the terms of the contract, at no time does the risk of loss fall on the distributor. The distributor's commission is fixed at a percentage of the net sales price of milk sold, even though the "price" obtained on behalf of the producers may be below the producers' cost. It is well settled that risk of loss attends title in the absence of an express agreement to the contrary. As stated by Samuel P. Wil-

liston, the eminent authority on contracts and sales:

"In the English and American law of sales of goods there is singularly little discussion in regard to the risk before transfer of property. It was early assumed without discussion that the maxim *res periit domino* was of universal application, and this assumption has sufficed to fix the law."

2 Williston, *Sales,* § 301. See also Vold on *Sales* (2d Ed.), § 38, p. 225; R.L.H. 1955, § 202-22.

It is clear from the contract, as found by the tax appeal court, that the producers here bear the risk of loss while the milk is in the distributor's possession, at least until there has been an allocation to surplus. The contract neither expressly nor impliedly contemplates a transfer of title and retention of risk by the producers. *Cf.,* R.L.H. 1955, § 202-22.

We can only conclude that the contract here, construed in its entirety, created an agency relationship between the producers and the distributor. Consequently, the decision and judgment of the tax appeal court dismissing the tax appeals of the producers must be reversed and the case remanded to the tax appeal court to determine the tax consequences resulting from the marketing agreement as to the distributor and the producers.

*Frank D. Padgett (Robertson, Castle & Anthony* with him on the briefs) for Appellants.

*Ronald B. Greig,* Deputy Attorney General (*Nobuki Kamida,* Deputy Attorney General, on the brief) for Tax Commissioner, Appellee.